# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Commitment of Kelley*, 2012 IL App (1st) 110240

---

| | |
|---|---|
| Appellate Court Caption | *In re* THE COMMITMENT OF LEROY KELLEY (The People of the State of Illinois, Petitioner-Appellee, v. Leroy Kelley, Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-0240 |
| Filed<br>Rehearing denied | May 11, 2012<br>July 10, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The commitment of respondent to a secure facility as a sexually violent person was affirmed, notwithstanding his contentions that the trial court abused its discretion in denying his motion *in limine* to stipulate to his prior convictions and preclude the State from referring to those convictions by name and that he was denied a fair trial when the State argued the details of his past crimes as substantive evidence in closing arguments, since any error arising from the denial of respondent's motion did not warrant reversal in view of the overwhelming evidence that respondent was a sexually violent person and the limiting instructions given to the jury, and the State did not argue defendant's past crimes as substantive evidence but, rather, did so in response to respondent's attacks on the opinions of the State's experts. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-80003; the Hon. Timothy J. Joyce, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Daniel T. Coyne, Matthew M. Daniels, Elizabeth D. Leeb, Michael R. Johnson, and Emily D. Bock, all of Chicago, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and David H. Iskowich, Assistant Attorneys General, of counsel), for the People.

Panel

JUSTICE McBRIDE delivered the judgment of the court, with opinion.

Presiding Justice Epstein and Justice J. Gordon concurred in the judgment and opinion.

## OPINION

¶ 1       In 2010, a jury found respondent, Leroy Kelley, to be a sexually violent person under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 to 99 (West 2010)). Following a subsequent dispositional hearing, the trial court ordered respondent committed to the Illinois Department of Human Services (DHS) for institutional care in a secure facility. Respondent appeals, arguing that: (1) the trial court abused its discretion when it denied respondent's motion *in limine* to stipulate to his prior convictions for sexually violent offenses and to preclude the State from referring to the name of those convictions; and (2) he was denied a fair trial when the State argued details of his past crimes as substantive evidence in closing arguments.

¶ 2       The present action began on April 24, 2007, when the State filed a petition pursuant to the Act seeking to have respondent adjudicated a sexually violent person and committed to the care and custody of the DHS. The petition alleged that in 1977 respondent was convicted of the sexually violent offense of deviate sexual assault and that he was sentenced to a term of 40 years' imprisonment. The petition further alleged that respondent had been diagnosed with the mental disorder of paraphilia, not otherwise specified, nonconsenting persons (paraphilia NOS), which was a congenital or acquired condition affecting respondent's emotional or volitional capacity which predisposed respondent to commit acts of sexual violence. Finally, the petition alleged that respondent was dangerous because his mental disorder made it substantially probable that he would engage in acts of sexual violence.

¶ 3       On April 24, 2007, after reviewing the State's petition, the trial court ordered respondent transferred to a DHS detention facility upon his release from the Illinois Department of Corrections (DOC). On June 26, 2007, following a hearing on the petition, the trial court found that there was probable cause to believe that respondent was a sexually violent person and continued the order of detention until trial.

¶ 4       Prior to trial, respondent filed two motions *in limine* that are relevant to this appeal. In the first, respondent sought to stipulate that he had been convicted of sexually violent

offenses without the jury being informed of the names of those specific offenses. In the second motion, respondent sought to limit testimony by the State's expert witnesses regarding the details of respondent's prior sexually violent offenses. The trial court denied these motions but agreed to provide the jury with limiting instructions regarding how the testimony could be considered.

¶ 5     At respondent's jury trial, the State presented the testimony of two expert witnesses: Dr. Ray Quackenbush and Dr. Steven Gaskell. Dr. Quackenbush testified that he was a licensed clinical psychologist employed by Affiliated Psychologists, Ltd. He was also approved by the Illinois Sex Offender Management Board to provide treatment and evaluation of sexual offenders. The trial court found the doctor to be an expert in the field of clinical psychology.

¶ 6     Dr. Quackenbush testified that the DOC referred respondent for a full psychological evaluation to determine if he should be recommended for possible civil commitment as a sexually violent person, and the doctor was appointed to conduct that evaluation. As part of that evaluation, Dr. Quackenbush first reviewed respondent's master file, which was a "complete set of documents dealing with his criminal history and his involvement with the Department of Corrections." Among other things, the file included court records, victim statements, medical records and respondent's disciplinary history while in the DOC. All of these documents are reasonably relied upon by experts in conducting a sexually violent person evaluation. Dr. Quackenbush also interviewed respondent in December of 2006 at the Stateville Correctional Center for approximately 1 hour and 45 minutes. The doctor prepared a report after completing his evaluation on December 19, 2006. He then evaluated respondent again in April of 2007, which included updating his reading of respondent's master file and interviewing respondent again at the Dixon Correctional Center for 1 hour and 15 minutes. The doctor prepared a second report on April 18, 2007. Finally, to keep his opinion current for respondent's trial, Dr. Quackenbush reviewed additional documents as they became available, including records from the DHS treatment and detention facility where respondent was residing at the time of trial.

¶ 7     Dr. Quackenbush testified that in 1977 respondent was convicted of the sexually violent offense of deviate sexual assault and that the facts underlying that conviction were relevant to forming the doctor's opinion. In that case, respondent was on probation from another case when he confronted a woman exiting a garage. He put a knife to her throat and said, "don't scream or I'll kill you." He asked the woman for money, and when she said that she did not have any, he forced her to open the trunk of her car and stuffed a rag into her mouth. He then had her put his arms around him so it looked like they were together and they walked into her apartment. Respondent blindfolded the victim and took a number of items from her apartment. Respondent then opened his pants and showed the victim his penis and asked her to perform oral sex on him. She refused and respondent repeated his demand. When the victim again refused, respondent tied the victim's hands behind her back, placed her on the ground, and put a step ladder on top of her and left.[1] After a jury convicted him of deviate

[1] An "Official Statement of Facts" from the case, which is contained in the record, indicates that after respondent took valuables from the victim's apartment, he "forced the victim to perform

sexual assault, respondent was sentenced to 40 years' imprisonment.

¶ 8    Dr Quackenbush also considered the facts of two other sexually violent offenses for which respondent was convicted in 1973. In the first case, respondent and his brother and sister were walking down the street when they saw a woman they knew. Respondent forced the victim to the back of a building and then raped her. Afterwards, he told the victim he had been interested in her for some time and asked her to be his girlfriend. When respondent eventually let the victim leave, she went to her apartment and told her boyfriend what happened. When the boyfriend found respondent, respondent pulled a gun and then ran away. Respondent was convicted of rape in that case following a bench trial and was sentenced to four to six years' imprisonment.

¶ 9    Several months after this rape, respondent was arrested for another rape. In that case, respondent approached a vehicle containing two women and pulled a gun and entered the vehicle. After driving a short distance, respondent took both women out of the car and raped one of them in the backyard of a residence. He forced the women back into the car, drove a short distance, and then forced both women out of the car and raped them. Respondent pled guilty to rape and was sentenced to four to six years' imprisonment. Dr. Quackenbush testified that all three crimes were similar in that respondent used a weapon and forced the victim to engage in sexual activity against her will, and each had the potential to cause serious injury to the victim.

¶ 10    Dr. Quackenbush testified that in forming his opinion, he also considered the facts and circumstances of respondent's nonsexual criminal history. Respondent had an "extensive criminal history," including an arrest for burglary, an arrest and conviction for armed robbery, and an arrest and conviction for aggravated assault. During his interview, respondent also told Dr. Quackenbush about one sex crime that the doctor was unaware of. Respondent told Dr. Quackenbush that he was first arrested for statutory rape of his girlfriend when he was 19 and she was 16. When his girlfriend became pregnant, her father had respondent arrested but the charges were later dropped.

¶ 11    Dr. Quackenbush also considered the facts and circumstances of respondent's institutional adjustments in the DOC in forming his opinion in this case. Respondent had an "extensive disciplinary history in the [DOC]," including over 250 disciplinary actions against him. This was an "unusually high number," even for someone serving a long sentence. The facts of those disciplinary actions were important to the doctor. Several disciplinary actions were for sexual misconduct, and there were numerous disciplinary actions for fighting, intimidation or threats, arson, and throwing liquid on or attacking correctional officers. The sexual misconduct actions were important to the doctor because they occurred late in his sentence, and the most recent sexual misconduct occurred within two years of respondent's release from prison. In one instance, respondent was masturbating in front of a nurse and, in another, respondent forced an inmate to perform oral sex on him in a prison closet.

¶ 12    The doctor also considered the facts and circumstances of respondent's adjustment while

oral copulation upon him. [Respondent] was arrested nineteen days later for a different incident of similar procedures, placed in a line-up, and then identified by the victim."

on parole. Respondent had been on parole three times and he violated parole each time. His most recent sexual offense occurred while respondent was on parole for the two rape charges. While respondent was on parole the first time for his most recent conviction, he made threats against his "host" and the staff of the DOC. He demanded money from his host and attempted to get her to go to the cash machine and get money. He also attempted to have her submit to a full-body massage. His host finally "had enough" and went to the parole department. Respondent's parole was violated and he was returned to the DOC for six months. After he was again released on parole, respondent was hospitalized for a period of time for medical reasons. During his hospitalization, respondent was masturbating in his bed when a nurse walked into the room. He asked her to massage him and she refused. Respondent then wrote his phone number out and pressed it into the nurse's hand. On another occasion in the hospital, respondent propositioned a 14-year-old female hospital volunteer who entered his room. After she left his room, respondent tried to follow her down the hall shouting at and threatening her. Respondent's parole officer happened to visit the hospital shortly thereafter and was informed of the incident. Respondent was again returned to the DOC. Respondent kicked his parole officer in the chest and he also became violent while being transported to the DOC.

¶ 13   Dr. Quackenbush also considered that respondent did not participate in sexual offender treatment while in the DOC. Such participation is relevant to the doctor's evaluation. Respondent was offered treatment every year he was in the DOC but refused to participate. Respondent told the doctor that he did not need sexual offender treatment and that he felt getting treatment would interfere with getting his case back into court. On his second parole from his most recent case, respondent was required to attend outpatient sexual offender treatment. He had completed the entry evaluation to the program but he was terminated from the program when the program learned of his behavior at the hospital.

¶ 14   Respondent's behavior while in the DHS treatment and detention facility was also relevant to the doctor's evaluation. Respondent had attended an orientation group at the facility, which was positive, but he had thus far refused to enter into a core sex offender treatment program. Respondent had also exposed himself to staff members twice at the DHS facility.

¶ 15   Dr. Quackenbush used the Diagnostic and Statistical Manual of Mental Disorders IV (DSM-IV), which is the "authoritative reference" in his field, as part of his evaluation of respondent. The doctor diagnosed respondent with paraphilia, not otherwise specified, nonconsenting persons. The doctor explained that "the paraphilia is the disorder" and that "it's a deviant sexual practice or set of fantasies." According to the doctor, there are approximately 300 named paraphilias, most of which are not given a specific individual diagnosis but, instead, are given the paraphilia "not otherwise specified" (NOS) diagnosis. The "non-consenting persons" diagnosis indicates what type of paraphilia it is. There are two criteria for a diagnosis of parahilia NOS. The first is that the person has over a period of at least six months experienced either fantasies or sexual urges or behaviors involving sexual activity with a non-consenting person. In respondent's case, he had engaged in sexual activity with nonconsenting persons for approximately 39 years. The second criterion for the diagnosis is that the person must have either acted on his urges or fantasies and his sexual

behavior has caused him to suffer a major dislocation or impediment in his life. In respondent's case, he had been incarcerated for most of his adult life as a result of his sexual behavior. Respondent's mental disorder is also a congenital or acquired condition affecting his emotional or volitional capacity that predisposes him to commit acts of sexual violence.

¶ 16    Respondent also has a history of being diagnosed with three different personality disorders in prison: antisocial personality disorder, scats-affective disorder and paranoid personality disorder. None of these diagnoses has predominated, so Dr. Quackenbush diagnosed respondent as suffering from a personality disorder, not otherwise specified, with paranoid scats-affective and antisocial features. Personality disorders are difficult to diagnose and therefore it was not unusual for respondent to have been diagnosed with different personality disorders from different evaluators in the past. In terms of the criteria for diagnosing these personality disorders, Dr. Quackenbush relied upon respondent's history of being diagnosed by the psychiatrists in the DOC. These personality disorders "seriously exacerbate[ ]" respondent's paraphilia and "contribute to his inability to control his urges and behaviors."

¶ 17    Dr. Quackenbush also used several methods to evaluate respondent's risk of sexually reoffending. The first method used was an actuarial risk assessment. He explained that this involves considering things such as how many times the person has been arrested or convicted for a sexually violent crime, whether the victims were strangers or people known to the person, whether the victims were adults, male, female or children, and whether the person has been in treatment. All of the risk factors have been assigned statistical weights and those are added to arrive at a category of risk for the individual. In respondent's case, Dr. Quackenbush used two actuarial instruments: the Static-99 and the Minnesota Sex Offender Screening Tool Revised (MNSOST-R). Respondent scored in the "high risk" category on the Static-99 and specifically scored a 9, which was "one of the highest scores" the doctor had ever seen. That was also the "highest score that in the research on the Static 99 was produced." The doctor also stated that it was not unusual for evaluators using the Static-99 to arrive at different numbers because such a "standard error" is built into all psychological tests. Respondent scored a 17 on the MNSOST-R, which placed him in the "high risk" category.

¶ 18    Dr. Quackenbush also used the Hare Psychopathy Checklist, which is a personality test used to measure a very narrow personality trait, psychopathy. He explained that "it's similar to anti-social personality disorder, but it's a more narrow concept and it involves a remorseless use of other people and leading a criminal lifestyle." Respondent scored in the 96th percentile, meaning he has a "higher degree of psychopathy than 96 percent of incarcerated prison inmates."

¶ 19    Dr. Quackenbush also considered several dynamic risk and protective factors in respondent's case that "can serve as targets for intervention and therapy." He considered respondent's "deviant sexual preference." He also considered respondent's "interpersonal difficulties, that he doesn't relate well to other people as shown by his criminal history and as shown by his disciplinary history in the [DOC]. And the notes from the treatment detention center also showed that he's had a lot of trouble getting along with other people there." The doctor also considered respondent's age as a factor. This was "very important"

because for some individuals age can be a mitigating protective factor but this was not the case with respondent because his most recent sexual behavior with nonconsenting persons had been about a year before, and so respondent "still seem[ed] to be very active in committing sex offenses." Dr. Quackenbush also considered respondent's failure to complete a treatment program because research indicates "that a good sex offender treatment program can reduce the likelihood of someone committing an act of sexual violence in the future." Ultimately, all of the items the doctor considered in his risk assessment were consistent with respondent's total risk assessment and indicated that respondent was at a high risk of committing future acts of sexual violence.

¶ 20　　Based upon all of his considerations, and in his opinion to a reasonable degree of psychological certainty, Dr. Quackenbush opined that it was substantially probable that respondent would commit future acts of sexual violence. By "substantially probable," the doctor meant "much more likely than not."

¶ 21　　On cross-examination, Dr. Quackenbush acknowledged that respondent had not been charged with or convicted of any criminal offense since 1977. He also agreed that his understanding of respondent's parole violations was based entirely on records generated by parole officers.

¶ 22　　The State's next witness was Dr. Steven Gaskell, a clinical and forensic psychologist who specialized in the assessment and treatment of mental disorders. Dr. Gaskell testified that he is also a registered evaluator with the Illinois Sex Offender Management Board. The trial court accepted Dr. Gaskell as an expert in the field of clinical psychology.

¶ 23　　Dr. Gaskell evaluated respondent pursuant to a court order. He did not interview respondent because respondent would not participate in the interview. Dr. Gaskell testified that he considered respondent's master file as part of his evaluation, and his testimony regarding the facts and circumstances of respondent's criminal history was essentially the same as the testimony given by Dr. Quackenbush. He added that in the 1973 rape case, respondent beat and sexually assaulted the victim after telling the victim that he had a gun and that he would kill her if she did not submit to his sexual advances. The doctor testified that in the 1977 case respondent forced the victim to perform oral sex on him. Regarding respondent's past nonsexual criminal history, Dr. Gaskell testified that in 1965, when respondent was 13 years old, he was convicted of aggravated assault and possession of a deadly weapon after he took a gun to school with the intent to kill a 16-year-old male who had been picking on him. Respondent had a "run away charge" as a juvenile that was a violation of his probation. He was convicted of robbery in 1970 and he had a "warrant failure" in the early 1970s. Respondent had another offense three weeks after the 1977 robbery and deviate sexual assault. It was a similar case in that he approached a woman and asked her for money. She said she did not have any money and respondent began to lead her down an alley until a car drove by and scared him off. He was convicted of attempted armed robbery and sentenced to 15 years' imprisonment.

¶ 24　　Dr. Gaskell also considered respondent's behavior and the disciplinary actions taken against him in the DOC, and his testimony closely tracked the testimony of Dr. Quackenbush. He added that during respondent's 2005 parole, he went to the home of a DOC

employee and harassed the employee's daughter. In November of 2005, he swore at an "AMS operator" and on another occasion propositioned an AMS operator. An AMS operator is someone connected with respondent's parole. The final incident, described by Quackenbush, was when he tried to get his "host" to submit to a body massage and then go to a cash machine and get him money. Dr. Gaskell also added that when respondent was on parole in 2006, he kicked the door in on the cage of the state vehicle taking him to prison and threatened to kill his parole officer and the officer's family. Like Dr. Quackenbush, Dr. Gaskell also considered respondent's behavior while in the DHS treatment and detention facility and his testimony was substantially the same as the testimony of Dr. Quackenbush.

¶ 25 Dr. Gaskell also employed the DSM-IV and diagnosed respondent with paraphilia, not otherwise specified, sexually attracted to nonconsenting females and antisocial personality disorder. These mental disorders predispose respondent to commit acts of sexual violence and were congenital or acquired conditions that affected his emotional or volitional capacity in that respondent "has urges and fantasies to have sexual contact with non-consenting persons." Respondent also has "a failure to conform to social norms" so that "he doesn't really have a filter or something that's going to stop him from making a different decision when he has those urges." The doctor defined the antisocial personality disorder as "a pervasive pattern of disregard for and violations of the rights of others occurring since at least the age of 15." Dr. Gaskell also diagnosed respondent with cannabis abuse in a controlled environment and psychotic disorder, not otherwise specified.

¶ 26 The doctor acknowledged that respondent had not sexually attacked anyone while in custody but testified that this did not alter his opinion because "it's a really infrequent event that someone would actually sexually assault someone within a facility." Respondent also has not had the opportunity to arm himself within the DOC or the DHS treatment and detention facility.

¶ 27 Dr. Gaskell employed the Static-99 and respondent fell into the "high risk" category for that test. Respondent scored an 8 on the Static-99 and other sexual offenders have an average score of 2. Dr. Gaskell also used the MNSOST-R and respondent again placed in the "high risk" range. The doctor then considered seven additional risk factors that pertained to respondent, including antisocial personality disorder, high score on the "PCLR," substance abuse, general self-regulation problems, impulsiveness, recklessness, any deviant sexual interests and employment stability. A consideration of these factors placed respondent at an even higher level of risk. The doctor did consider protective factors that could reduce respondent's risk of sexually reoffending. These included his age, his health, and any progress in sex offender treatment. However, respondent had refused to participate in sex offender treatment while in the DOC. In 2006, he was in treatment in Will County for five weeks but he had poor progress and was terminated from the program. Since that time, he has not participated in sex offender treatment in the DOC or in the DHS treatment and detention facility.

¶ 28 The doctor testified that in his opinion, to a reasonable degree of psychological certainty, it was substantially probable that respondent would commit future acts of sexual violence. According to the doctor, "substantially probable" meant more likely than not.

¶ 29    The State concluded its case by presenting a stipulation that respondent had been convicted of three sexually violent offenses: (1) deviate sexual assault, in Cook County case number 77 I 40396, which resulted in a 40-year term of imprisonment; (2) rape, in Cook County case number 73 C 2980, for which he was sentenced to 4 to 6 years' imprisonment; and (3) rape, in Cook County case number 73 C 3176, for which he was sentenced to a term of 4 to 6 years' imprisonment to run concurrently with the sentence in case number 73 C 2980. The defense rested without presenting any evidence on respondent's behalf.

¶ 30    After closing arguments, the trial court denied respondent's motion for a mistrial based on allegedly improper remarks made by the State during its rebuttal argument. The jury returned a verdict finding that respondent was a sexually violent person. Following a subsequent dispositional hearing, at which Dr. Gaskell opined that respondent should be placed in secure care in the DHS, the trial court ordered respondent be held in institutional care in a secure facilty. This appeal followed.

¶ 31    The Act defines a sexually violent person as an individual who "has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2006). To show that respondent is a sexually violent person, the State is required to prove beyond a reasonable doubt that respondent: (1) has been convicted of a sexually violent offense; (2) has a "mental disorder" as defined by the Act; and that (3) he "is a danger to others because the mental disorder causes a substantial probability that the subject will commit acts of sexual violence." *In re Detention of Hardin*, 238 Ill. 2d 33, 43 (2010) (citing 725 ILCS 207/5(f), 15(b) (West 2006)). The Act defines a "mental disorder" as a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2006). On review, we ask only whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt. *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 598 (2007).

¶ 32    Respondent first contends that the trial court erred by denying his motion *in limine* to stipulate to his prior convictions for sexually violent offenses and to preclude the State from referring to the name of those convictions.

¶ 33    A ruling on a motion *in limine* is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion. *People v. Nelson*, 235 Ill. 2d 386, 420 (2009). An abuse of discretion occurs only when the trial court's ruling is "arbitrary, fanciful, or unreasonable or where no reasonable [person] would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Santos*, 211 Ill. 2d 395, 401 (2004).

¶ 34    In his motion, respondent analogized his situation to criminal cases where proof of a prior felony conviction is an element of the offense and claimed that, in his case as well, he would be unfairly prejudiced by allowing the State to discuss and elicit testimony regarding the names and nature of his prior convictions. See *Old Chief v. United States*, 519 U.S. 172, 191-92 (1997) (holding that when felon status is all the prosecution is required to prove, evidence of the name and nature should be excluded because it has no probative value and carries a high risk of unfair prejudice); *People v. Walker*, 211 Ill. 2d 317, 338 (2004) (applying *Old*

*Chief* to Illinois law).

¶ 35 In *Walker*, 211 Ill. 2d at 320, 328, the defendant was charged with possession of a weapon by a felon and the issue on appeal was whether the trial court abused its discretion by allowing the prosecution to present evidence of the name and nature of defendant's prior conviction when a stipulation was available. The court held that "where the prosecution's sole purpose for introducing evidence of a defendant's prior felony conviction is to prove his status as a convicted felon and the defendant offers to stipulate to this element, the probative value of the name and nature of the prior conviction is outweighed by the risk of unfair prejudice and, thus, should be excluded." *Walker*, 211 Ill. 2d at 341. The court reasoned that in cases requiring proof of felon status, the admission of the defendant's record of convictions creates a risk that he will be unfairly prejudiced that "because the only purpose for admitting a defendant's prior-conviction record is to establish felon status, the name and nature of the prior convictions is unnecessary surplusage without any evidentiary significance." *Walker*, 211 Ill. 2d at 338. The court concluded that "when proving felon status is the only purpose for admitting evidence of a defendant's prior convictions, and the defendant offers to stipulate or admit to his prior felon status, a trial court abuses its discretion when it admits the defendant's record of conviction, thus informing the jury of the name and nature of the defendant's prior convictions." *Walker*, 211 Ill. 2d at 338.

¶ 36 In this case, in his motion *in limine*, respondent relied upon *Walker* to assert that he would be unfairly prejudiced if the State were allowed to inform the jury of the names and nature of his convictions for sexually violent offenses. The trial court denied respondent's motion because the Act required proof that defendant had been convicted of specific sexually violent offenses and because "the manner in which any offenses were committed may all be much more highly relevant than any particulars regarding a particular conviction in the *Old Chief* or *Walker* context."

¶ 37 Respondent claims the trial court's ruling was an abuse of discretion. He asserts that the names of his prior convictions were relevant only to prove that he had been convicted of a sexually violent offense, that this requirement could have been satisfied by a stipulation, and that the names and nature of his prior convictions were "unnecessary surplusage" that should have been barred as unfairly prejudicial.

¶ 38 After reviewing the record, we find that the present case is distinguishable from *Walker* and that, based upon the unique facts of this case, the trial court's ruling was not an abuse of discretion. The court in *Walker* stated that its holding was a "narrow one" that was limited to situations where the prosecution's sole purpose for introducing evidence of defendant's prior felony convictions was to prove his status as a convicted felon and where the defendant offered to stipulate to that element. See *Walker*, 211 Ill. 2d at 341. In this case, unlike in *Walker*, the State did not discuss or elicit testimony of the name and nature of respondent's prior convictions for the sole purpose of proving that he had been convicted of a sexually violent offense. Rather, the State had multiple purposes for eliciting this testimony. First, in order to satisfy its burden under the Act, the State was required to prove that respondent had been previously convicted of one or more sexually violent offenses that are specifically enumerated in the Act. See 725 ILCS 207/5(e)(1) to (e)(3) (West 2008). The State also sought to elicit this testimony in order to allow its expert witnesses to explain the basis of

their opinions. Dr. Quackenbush and Dr. Gaskell testified that they relied upon the nature of respondent's prior convictions in arriving at their opinions in this case. It is well settled that "[a]n expert witness may properly testify to facts upon which [his or] her opinion is based." *In re Detention of Lieberman*, 379 Ill. App. 3d at 604-05. Thus, the stipulation defendant sought in his motion *in limine* would not have served the same purpose as testimony regarding his prior convictions, and we find nothing improper in the testimony of the State's expert witnesses in this regard. See *Big Chief*, 519 U.S. at 186-87 (stating that, under normal circumstances, the State has the right to present evidence with multiple utility and that if there is any other purpose for admitting evidence of the name and nature of a prior conviction, the prosecution must be allowed to present it).

¶ 39    Moreover, the record shows that after the testimony of Dr. Quackenbush and Dr. Gaskell, the trial court instructed the jury that the testimony of each witness regarding respondent's past instances of misconduct was allowed for the limited purpose of explaining the basis of each expert's opinion and was not to be considered as substantive evidence. The trial court also instructed the jury on this principle orally and in writing at the conclusion of trial. There is a presumption that jurors follow the instructions given by the court, and we find nothing in the record to rebut that presumption. For these reasons, we cannot say that the trial court's denial of respondent's motion *in limine* was "arbitrary, fanciful, or unreasonable" and thus that ruling was not an abuse of discretion. See *In re Detention of Lieberman*, 379 Ill. App. 3d at 605 (in the respondent's sexually violent person trial, trial court did not abuse its discretion by allowing the State's expert witness to testify to the details of the respondent's past crimes where the expert relied upon those facts in arriving at her opinion, where the trial court gave the jury limiting instructions regarding that testimony, and where jurors are presumed to follow the court's instructions).

¶ 40    We have also reviewed the evidence presented to the jury and find that it overwhelmingly established that respondent was a sexually violent person. In light of the overwhelming evidence and the limiting instructions given to the jury, any possible error in denying respondent's motion does not warrant reversal. See *People v. Parker*, 335 Ill. App. 3d 474, 488 (2002) (holding that where "the State's proof as to the element of knowing possession of a firearm is overwhelming, and where the trial court provides an instruction limiting the jury's use of evidence of the nature of defendant's prior felony conviction to proof of felon status only, the attendant risk that the introduction of that evidence would 'lure the [jury] into declaring guilt on a ground different from proof specific to [unlawful use of a weapon by a felon]' (*Old Chief*, 519 U.S. at 180 ***) is so low as to be negligible, the nature of defendant's prior felony notwithstanding").

¶ 41    Respondent next contends that he was denied a fair trial because the State improperly referred to details of his prior sexual misconduct in closing arguments. Respondent claims that the State improperly argued those details as substantive evidence in its rebuttal argument.

¶ 42    The prosecution is afforded wide latitude in making closing arguments so long as the comments made are based on the evidence or reasonable inferences drawn therefrom. *People v. Williams*, 192 Ill. 2d 548, 573 (2000). The prosecution may comment upon the credibility of the witnesses and the defense characterizations of the evidence or case and it may respond

-11-

in rebuttal to statements made by the defense counsel that clearly invite a response. *People v. Gonzalez*, 388 Ill. App. 3d 566, 590 (2008). When we review a challenge to remarks made by the prosecution during closing arguments, the comments must be considered in context of the entire closing arguments made by both parties. *People v. Wiley*, 165 Ill. 2d 259, 295 (1995). A reviewing court will not reverse a jury's verdict based upon improper remarks made during closing arguments unless the comments were of such magnitude that they resulted in substantial prejudice to defendant and constituted a material factor in his conviction. *People v. Griffin*, 368 Ill. App. 3d 369, 376 (2006).

¶ 43    Respondent specifically complains of the following remarks made by the prosecutor. During rebuttal, the State commented that defense counsel was correct "that the Respondent has not raped anybody in thirty-three years" because he lacked the opportunity, stating, "ask yourselves has he had the opportunity to get himself a gun or a knife, hold it to somebody's throat and rape them?" The State then said that respondent "has been in controlled environment virtually his whole life. Since he was 13 years old he went to the [Audy] home for a period of time." The State proceeded to argue that after respondent was released from prison in 2006, "he goes to Hindsdale hospital and he propositions a 14 year-old girl in a hospital, a volunteer." After the trial court overruled defense counsel's objections to these comments, the State continued that respondent "tells a nurse to massage his erect penis. That is sexually deviant and that happened in 2006. That's not–that is not thirty-three years ago. That's what happened when he was let out on parole in 2006." The trial court again overruled defense counsel's objection to these comments.

¶ 44    In this case, when viewed in context, it is apparent that the prosecutor's rebuttal remarks were made in response to comments made by defense counsel in closing arguments. During closing, the State argued that respondent's history of sexual misconduct supported the experts' opinions and helped prove beyond a reasonable doubt that respondent suffered from a mental disorder. In response, defense counsel argued in closing that the jury should not give weight to the opinion of the State's experts because the facts upon which they based their opinions were incorrect. Defense counsel pointed to Dr. Quackenbush's testimony that he relied upon respondent's 39-year history of sexually reoffending and then stated, "What thirty-nine year history? He had sexually violent offenses from 1973 to 1977, thirty-nine years ago." Counsel further argued that respondent was convicted "over a four-year period thirty years ago" and that it was not "a thirty-nine year period where he was continuously offending." Counsel also argued that respondent "had a history of reoffending that lasted [from] 1973 until 1977 and not the thirty-nine years that Dr. Quackenbush would have you believe. He could have offended again while he was incarcerated or while he was on parole, but he was never charged or convicted of anything."

¶ 45    In response to this line of argument by defense counsel, the prosecutor made the complained-of remarks. In response to defense counsel's argument that respondent committed sexually violent offenses only over a four-year period and that his last sexually violent offense occurred in 1977, the State acknowledged that respondent had not committed a rape since 1977 but claimed that he had been incarcerated for most of his adult life and that he lacked the opportunity to commit additional sexually violent offenses while incarcerated. To further this point, the State pointed out that respondent had reoffended or committed an

act of sexual violence each time he had been released on parole. To illustrate this point, the State reviewed respondent's sexual misconduct since he he had been released on parole in 1977 until 2006. Thus, the State did not argue respondent's past crimes as substantive evidence but, instead, argued reasons why the jury should credit the testimony of its expert witnesses in response to defense counsel's attacks on the basis of their opinions. Accordingly, we cannot say that the trial court abused its discretion when it overruled respondent's objections to the State's remarks and we also cannot say that those remarks denied respondent a fair trial.

¶ 46   Moreover, as set forth above, the trial court gave the jury limiting instructions after the testimony of Dr. Quackenbush and Dr. Gaskell. The court also gave the jury the limiting instruction orally and in writing at the conclusion of trial. Finally, the trial court instructed the jury that closing arguments were not to be considered as evidence. There is nothing in the record to rebut the presumption that the jurors followed these instructions and we therefore find that the court's instructions were sufficient to alleviate any risk that the jury considered the State's closing arguments as substantive evidence in returning its verdict. See *In re Detention of Lieberman*, 379 Ill. App. 3d at 605.

¶ 47   Although we have concluded that the comments were not improper, even if we were to conclude that the comments were an improper suggestion by the State to consider defendant's sexual misconduct as substantive evidence, based upon the evidence presented and the entire record, we cannot say that these comments were of such magnitude that they resulted in substantial prejudice to defendant and constituted a material factor in his conviction. See *Griffin*, 368 Ill. App. 3d at 376.

¶ 48   In a related argument, respondent contends that the trial court erred by denying his motion for a mistrial. The record shows that at the conclusion of closing arguments, respondent moved for a mistrial based upon improper remarks made during the State's rebuttal arguments. Specifically, the defense claimed that the State argued the details of respondent's past crimes as substantive evidence that respondent should be found to be a sexually violent person. The trial court denied the motion because the State's argument was "amenable to the interpretation that they were stressing to the jury that those are the facts which the experts relied upon in reaching their conclusion."

¶ 49   The decision to declare a mistrial lies within the discretion of the court, and a mistrial should be declared only if there is some occurrence at trial of such a character and magnitude that the party seeking a mistrial is deprived of a fair trial. *People v. Leak*, 398 Ill. App. 3d 798, 819 (2010).

¶ 50   Respondent's contention is essentially a reiteration of his previous claim regarding the State's allegedly improper comments during rebuttal arguments. As we have already found, the State did not argue the details of respondent's past crimes as substantive evidence during closing arguments. Rather, the State referred to those past crimes in order to argue that the experts had a valid basis for their opinions and in order to respond to defense counsel's attack on the credibility and bases of those experts' opinions. We also again point out the limiting instructions given to the jury and the instruction that closing arguments were not to be considered as evidence. For these same reasons, we cannot say that the trial court abused

-13-

its discretion in denying respondent's motion for a mistrial.

¶ 51       For the reasons set forth above, the judgement of the circuit court of Cook County is affirmed.

¶ 52       Affirmed.