# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**In re Commitment of Fields, 2012 IL App (1st) 112191**

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF JUSTIN FIELDS (The People of the State of Illinois, Petitioner-Appellee, v. Justin Fields, Respondent-Appellant). |
| District & No. | First District, Third Division<br>Docket No. 1-11-2191 |
| Filed<br>Modified upon denial<br>of rehearing | November 14, 2012<br><br>December 28, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings seeking the commitment of respondent as a sexually violent person, the prosecutor's remarks in closing argument allegedly arguing expert's testimony as substantive evidence did not improperly shift the burden of proof, violate orders *in limine* or warrant a mistrial, and although respondent was proved to be a sexually violent person, the commitment order was vacated and the cause was remanded for a proper dispositional hearing, since the trial court erred in failing to allow respondent to present evidence at the dispositional stage. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-80002; the Hon. Michael B. McHale, Judge, presiding. |
| Judgment | Affirmed in part and cacated in part; cause remanded. |

Counsel on
Appeal

Law Offices of Chicago-Kent College of Law, of Chicago (Daniel T. Coyne, Matthew M. Daniels, and Elizabeth D. Leeb, of counsel), for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and Lindsay Beyer Payne, Assistant Attorneys General, of counsel), for the People.

Panel

JUSTICE STEELE delivered the judgment of the court, with opinion.

Justices Neville and Sterba concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial in the circuit court of Cook County, respondent Justin Fields was found to be a sexually violent person (SVP) under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2010)).[1] The trial court subsequently entered an order committing respondent to a secure facility for institutional care and treatment. On appeal, respondent argues that: (1) he was denied a fair trial when the prosecution improperly commented about his custodial status and nonparticipation in treatment, as well as improperly argued testimony from the State's expert witnesses as substantive evidence, during its closing argument that shifted the burden of proof and violated orders *in limine*; (2) the trial court erred in denying his motion for mistrial based upon the prosecution's allegedly improper remarks during closing argument; (3) the State failed to prove beyond a reasonable doubt that he was an SVP under the Act; and (4) he was denied his right to a dispositional hearing under the Act (725 ILCS 207/40(b) (West 2010)) before the commitment order was entered. While we reject respondent's challenges to the prosecutor's remarks during closing argument and the sufficiency of the evidence against him, we remand the cause to the trial court to conduct a dispositional hearing allowing respondent to present testimony and evidence for its consideration in framing the commitment order.

¶ 2                                    BACKGROUND

¶ 3    On August 23, 2005, the respondent, then 21 years old, was arrested and charged with with approximately 20 counts for various offenses, including aggravated criminal sexual

---

[1]The Act, which was enacted in 1998, authorizes the involuntary commitment of individuals beyond the time of release where the individuals are found to be sexually violent as defined by the Act. *In re Detention of Samuelson*, 189 Ill. 2d 548, 551-52 (2000). Additionally, the Act provides for periodic reexamination of such individuals to determine if they should be considered for conditional release or discharge. 720 ILCS 207/55 (West 2010).

abuse, aggravated kidnapping, and possession of a stolen motor vehicle, in Cook County circuit court case number 05 CR 21674. He subsequently pled guilty to one count of aggravated sexual abuse and one count of kidnapping stemming from the events involving a nine-year-old male victim. He was sentenced to three years' imprisonment in the Illinois Department of Corrections (DOC).

¶ 4                              Petition for Commitment

¶ 5        Prior to his mandatory supervised release, the State filed a petition on February 14, 2007, for respondent's involuntary commitment under the Act. The petition alleged, among other things, that respondent was an SVP as defined by the Act; that respondent was diagnosed by Barry Leavitt, Psy. D., as having the mental disorder of pedophilia; and that respondent's mental disorder made it substantially probable that he would engage in sexually violent acts. Dr. Leavitt's evaluation was attached to the petition.

¶ 6        On February 15, 2007, the trial court entered an order to have respondent detained in a facility under the custody of the Illinois Department of Human Services (DHS). On July 25, 2007, the trial court entered a memorandum opinion and order finding probable cause for respondent's commitment under the Act following hearings that commenced on April 17, 2007, and concluded on June 18, 2007. Counsel for the parties filed jury demands on the same date. Further, Lesley Kane, Psy. D., was appointed as the respondent's expert to conduct an assessment and evaluation of the respondent.

¶ 7                               Pretrial Proceedings

¶ 8        Prior to trial, the parties engaged in discovery, including depositions and document production, and respondent filed various motions. For the purposes of our discussion, this section highlights motions *in limine* related to the issues raised on appeal. On August 30, 2010, respondent filed two motions *in limine*. One motion sought to limit testimony about the respondent's background proffered by the State's witnesses only to show the bases for their opinions and not as substantive evidence in accordance with *Wilson v. Clark*, 84 Ill. 2d 186 (1981). Respondent also requested an appropriate instruction for the jury. The second motion sought to preclude any testimony regarding respondent's custodial status, to which the State objected.

¶ 9        On September 17, 2010, the trial court conducted a hearing on respondent's motions. The trial court granted the motion brought under *Wilson*, with no objection by the State. The trial court agreed to provide a limiting instruction to the jury before each witness testified and during closing instructions. The trial court also cautioned the State to preface comments during closing arguments that the information was relied upon by the witnesses in forming their opinions. As for the motion regarding respondent's custodial status, the trial court granted the motion in part, admonishing the State not to make "unnecessary or gratuitous" references to respondent's custodial status. In response to the State's request for clarification, the trial court indicated it was acceptable to ask routine questions, such as where an interview with respondent occurred, and noted respondent's custodial status would come up in anticipated discussion regarding disciplinary tickets contained in respondent's master file.

Indeed, the trial court expected the term "did" would have to be used relative to respondent's conduct while in custody.

¶ 10                                   Trial Proceedings

¶ 11        After some continuances, the jury trial was scheduled to begin on March 22, 2011. On March 22, 2011, the jury was selected. Before the trial proceedings began the following day, respondent moved *in limine* for the trial court to instruct the jury before and after every witness's testimony, as well as prior to deliberations, about the limited purpose of their testimony about respondent's background under *Wilson* in explaining the bases for their opinions and not as substantive evidence. The State objected to the limiting instruction being read after each witness's testimony. Referring to his notes when the issue was previously raised, the trial judge denied the request and indicated he would issue the limited instruction to the jury before each witness testified and with the closing instructions. The court then proceeded with other preliminary matters, including admonishing the jury about respondent's innocence until proven guilty, the State having the burden to prove beyond a reasonable doubt its allegations, and the opening statements by the parties were not evidence. The State called Dr. Leavitt as its first witness. Before he testified, the trial judge cautioned the jury, consistent with the order *in limine*, about the limited purpose of his testimony.

¶ 12                                   Leavitt Testimony

¶ 13        Dr. Leavitt testified that he was a licensed psychologist in Illinois and had been licensed to practice for approximately 25 years. He had his own clinical and forensic practice that involved general and psychological treatment of juveniles and adults individuals, and specialized forensic assessments of sexually violent persons in Illinois and other jurisdictions and of issues that may be relevant in court. He previously worked for about 25 years with Affiliated Psychologists, a clinical and forensic practice located in Chicago, Illinois, that had a contract with the DOC to conduct screenings. He described his educational background, which included a doctoral degree and a master's degree in clinical psychology. Over the last 25 years, he specialized in the general area of sexual abuse, with the last 15 or more years focusing in the area of evaluation and risk assessments of juvenile and adults who had committed assorted sexual offenses. He noted that the "far majority" of evaluations did not result in SVP referrals. Since 1998, he had conducted nearly 200 evaluations of sex offenders and SVPs. Moreover, he had conducted or overseen approximately several thousand screenings for the DOC's sexually violent persons unit while working at Affiliated Psychologists. Along with membership in various professional organizations, he had been approved by the Illinois Sex Offender Management Board regarding assessment and treatment of adult and juvenile sex offenders. He had testified and been qualified as an expert in clinical and forensic psychology, specifically regarding sex offender evaluations, diagnosis and risk assessments, over 100 times in Illinois courts throughout the state. The State tendered Dr. Leavitt as an expert witness. The trial court qualified him as an expert, with no objection by the respondent.

¶ 14        Dr. Leavitt testified that he was familiar with the general purpose of the Act. He

explained the DOC's responsibility related to the Act to screen, evaluate, interview, and identify persons who met the criteria, and report opinions about potentially eligible persons to the Attorney General's office for consideration. In 2007, Affiliated Psychologists had a contract with the DOC to conduct screenings, evaluations, and interviews. He reiterated that about 90% of the individuals screened did not meet the necessary criteria for commitment under the Act (due to no diagnosis and/or no risk), and that less than 5% were referred to the next phase after screening. He conducted a clinical evaluation of the respondent, who was scheduled for release on February 19, 2007, to determine if he was a candidate for commitment under the Act. Respondent agreed to the interview, which lasted approximately 3½ hours, and only the two of them were present. He stated that he followed the standard protocol in evaluating respondent. Prior to his interview with respondent, he reviewed records made available by the DOC, such as respondent's master file, which consisted of disciplinary reports, criminal history (with details about the offense for his current imprisonment), medical and health evaluations, and other materials available in his correction file, along with police reports and treatment evaluations. He testified that these documents were the type reasonably relied upon by experts in the field when conducting evaluations, and that he relied upon these documents in evaluating respondent. He prepared a written evaluation on February 12, 2007. At some point after his report, he learned respondent's birth date on the report, which was based upon the records he reviewed, was inaccurate as respondent was a year younger than the date on the records.

¶ 15     Dr. Leavitt testified that respondent's criminal history was relevant in forming his opinion. He testified about a 2005 offense involving aggravated criminal sexual abuse and kidnapping, to which respondent pled guilty and for which he was sentenced to three years' incarceration after being charged with over 20 counts. When respondent was 21 years old, he asked a 9-year-old male whom he knew to get into a stolen car that respondent was driving and offered to buy gym shoes for the minor. Respondent drove to a vacant or abandoned apartment building where he fondled the minor's genitals while the child was lying on the floor. According to the record Dr. Leavitt reviewed, respondent refused to stop at the victim's request. When the victim began crying, respondent stopped, drove the victim to a gas station, and told him to walk home. He also reviewed respondent's signed handwritten statement confessing to his actions and expressing experiencing sexual arousal from the encounter. Respondent denied committing the offense when he met with Dr. Leavitt.

¶ 16     He also considered an offense that occurred on May 24, 2000, when the respondent was 15 years and 8 months old and was riding a bicycle with a 9-year-old male on the back. Respondent rode into an alley, turned around, and fondled the minor's genitals through his sweat pants. Although respondent was initially charged with criminal sexual assault, he eventually pled guilty to simple battery, was adjudicated a delinquent, and sentenced to probation. The victim's mother requested that respondent be charged with a lesser offense if he received counseling. Dr. Leavitt testified that respondent also denied committing this offense during their meeting. Although the respondent's conviction was for simple battery, he considered the offense and stressed that viewing the details of a given case was important because many offenses contained a sexual component that was helpful in understanding

potential mental disorders and potential risks.

¶ 17    Dr. Leavitt testified that the details surrounding these offenses were important for two primary reasons: both offenses involved nine-year-old males and the second incident reflected an escalation in respondent's behavior from the first offense.

¶ 18    Dr. Leavitt further testified he considered respondent's nonsexual juvenile and criminal history in forming his opinions. He testified about respondent accruing curfew violations and school truancy beginning at age 10; being expelled from his home at age 12; being adjudged delinquent and charged with aggravated arson at age 14; selling drugs between ages 15 and 17; and being in and out of various juvenile detention facilities from ages 13 to 18. Additionally, he referred to records showing respondent reportedly used aliases and different birth dates during contact with law enforcement. He also testified about respondent's intimate life, as respondent stated that he could not meaningfully relate, including sexually, to anyone near his age. During their interview, respondent described having a relationship with a much older woman prior to his imprisonment and dating older women while an adolescent.

¶ 19    Moreover, Dr. Leavitt testified that respondent's behavior while in DOC custody was relevant in forming his opinion. He testified about two particular incidents involving sexual misconduct that occurred while respondent was in the DOC's juvenile division. The first incident, which occurred in February 2002, involved the staff observing respondent "firmly" grabbing another resident's buttocks and laughing when the staff reprimanded him. The second incident, occurring a few weeks later, involved the staff observing respondent trying to retaliate against another resident by grabbing the other resident's buttocks. Dr. Leavitt indicated that these incidents demonstrated respondent's inability or refusal to control his impulses, even in a structured environment.

¶ 20    Dr. Leavitt opined about respondent's behavior while in a DHS treatment and detention facility that he found relevant. In March 2009, a drawing of a nude child with a male figure standing over the child was discovered in respondent's laundry. In April 2010, respondent was investigated for creating and distributing child pornography on a flash drive to other residents.[2] The DVD reportedly contained enlarged images of young children's private parts, such as genitals and buttocks. Dr. Leavitt admitted that he did not see the images depicted in the drawing or on the DVD. He believed that this showed respondent's preoccupation with young males. During the four years while respondent was there, the records showed that respondent had numerous notations and violations of rules, including a physical fight in July 2010 with a resident believed to be involved in the DVD investigation, which exhibited respondent's behavioral problems consistent with antisocial attitude.

¶ 21    He also testified about whether respondent participated in sex offender treatment. He did not know if such treatment was offered while respondent was in DOC custody. He noticed respondent briefly attended a few sessions early on before withdrawing. Respondent also participated in a few groups, but overall, Dr. Leavitt saw no indication that respondent

---

[2]The record refers to the material as a DVD and a flash drive. We will use the term "DVD" in this opinion for consistency.

participated in specific sex offender treatment for a sustained period. When they met in 2007, respondent told him that treatment "would be a waste of time," but that he would attend if required to do so.

¶ 22    Dr. Leavitt testified that he relied upon the Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition) Text Revised (DSM-IV-TR), an authoritative manual in his field, in making his diagnosis. He formed an opinion, within a reasonable degree of psychological certainty, that respondent suffered from a mental disorder of pedophilia, with a secondary diagnosis of antisocial personality disorder. He also testified about the age of onset for an offender in diagnosing pedophilia disorder as respondent was 15 years and 8 months old when he committed the 2000 offense. He opined that the incidents in the DHS facility confirmed his opinion as they involved continued sexually deviant behavior, even in a structured environment. He emphasized that pedophilia is the mental disorder affecting respondent to commit future sexually violent acts and described how the two diagnoses worked together, with the secondary diagnosis serving as an additional risk factor regarding respondent's refusal or inability to adhere to any external controls.

¶ 23    Dr. Leavitt testified about the criteria he considered in making his diagnosis of respondent's antisocial personality disorder: since age 15, he demonstrated a general disregard and disdain for rules and welfare of others, manifested by the tendency to break societal rules that led to arrest and/or incarceration, and the disciplinary violations that respondent accrued.

¶ 24    Dr. Leavitt used and relied upon three actuarial instruments in forming his opinion. The Static 99, which was the most widely used in the field for placing an individual in the risk category of recidivism, contained 10 items. A score of six or higher was considered high risk of reoffending; respondent scored an eight. The Static 99R was a revised version of this instrument and included an adjustment of the age-related (and first) factor. Respondent also scored an eight on this instrument, which placed him in a high risk category. Dr. Leavitt also utilized the Minnesota Sex Offender Screening Tool Revised (MnSOST-R) that contained 16 items. The score was based on a combined record review and self-reported information to place the individual within a risk category over a six-year period of time to determine whether the person would be re-arrested for committing a sexually offensive act. Using this instrument, respondent scored nine, which placed him in a high risk category. Dr. Leavitt explained that this score translated into a 57% likelihood of an arrest for a sexual offense within six years. He noted that the actuarial tests were starting points and were more likely to underestimate the risk of reoffending.

¶ 25    In addition to the instruments, Dr. Leavitt testified about dynamic factors (potentially changeable factors) he considered that further substantiated understanding of an individual's risk level. He viewed respondent's history in applying five factors. First, he testified about respondent's early onset and persistence and/or preoccupation with young male children and difficulty controlling impulses. Second, he noted respondent's lack of meaningful sexual or dating relationships with age-appropriate persons. Third, he cited respondent's difficulty with sexual impulses and urges, anger, and lack of appreciation for self. Fourth, he testified about respondent's long-standing history of antisocial behavior, showing "clear resistance to supervision," and resistance to personal change. Finally, he addressed relevant protective

factors, namely, what respondent had done with respect to sex offender specific treatment and the person's age. He found no protective factors applied to respondent. He noted that respondent was not over 50 or 60 years old and did not have a life-threatening health condition that would reduce the risk of recidivism. He stated that the actuarial scores, dynamic risk factors, and protective factors worked together in forming his opinion about respondent's potential for reoffending. He opined, to a professional degree of certainty, that due to respondent's pedophilia, there was a substantial probability of respondent reoffending. His conclusion was the same as when he first interviewed respondent in 2007, but was more solidified as of the date of his testimony, based upon respondent's behavior over the past few years that included continued indications of pedophilia and antisocial behavior, even within a highly structured environment, and no sustained information of any sex offender treatment. He updated his opinion by reviewing records dated up to February 14, 2011.

¶ 26      On cross-examination, Dr. Leavitt admitted that he had not met with or spoken to respondent since the January 2007 interview. He did not speak with any other psychologist who evaluated respondent or any of the victims or respondent's friends, noting that speaking to witnesses, victims, or persons involved in the investigation was not part of protocol. When respondent's counsel questioned him about how he determined the onset age for his pedophilia diagnosis, Dr. Leavitt stated that the age at the time of diagnosis was relevant in making his diagnosis. While he did not view the images on the DVD, Dr. Leavitt emphasized that the reports he reviewed indicated that the DVD contained suggestive, sexual images of young male children, which matched respondent's victim profile. He also clarified the DVD contained downloaded images, enlarged to focus on particular body parts, and were unlike illustrations at issue with the other behavioral incident in DHS facility.

¶ 27      Although antisocial personality disorder was not the mental disorder that rendered respondent an SVP under the Act, the disorder was a risk factor that increased the likelihood of increased sexual acts and displayed respondent's general propensity to engage in criminal behavior. He emphasized respondent's behavior, and not the age of residents involved in the minor violations, was key as it demonstrated inappropriate behavior and disregard for rules within the structured setting. While he considered the actions could have been horse playing and did not consider whether they were imitating athletes by grabbing each other's buttocks, he distinguished respondent's actions as firmly grabbing the other resident's buttocks, which was uncommon and inappropriate, respondent laughed it off, and respondent repeated the behavior two weeks later.

¶ 28      Respondent's counsel questioned him about his use of the actuarial instruments. He clarified that the instruments assessed the likelihood of reoffending and did not predict whether respondent would reoffend. Dr. Leavitt emphasized that he considered the overall offending behavior involved in the 2005 offense, not just that respondent reportedly lured the victim into the car, in determining force used. Similarly, he testified that when he reexamined the individual dynamic risk factors, he found respondent's nonparticipation in sex offender treatment rendered it unlikely in assessing whether such treatment was meaningfully impacted.

¶ 29      On redirect examination, Dr. Leavitt stated that even after he found out about the age discrepancy, his opinion regarding respondent remained unchanged. After the trial court

overruled the objection, Dr. Leavitt explained that the enlarged images of the private areas of characters on the DVD led to his conclusion that, minimally, sexually suggestive pictures of young children were consistent with respondent's victim profile and demonstrated unresolved and continued preoccupation with young male children.

¶ 30                                    Gaskell Testimony

¶ 31      The State then called Dr. Steven Gaskell to testify.[3] The trial judge admonished the jury about the limited purpose for his testimony and advised the jury that it determined the credibility of the witness's testimony. Dr. Gaskell testified that he had been a licensed psychologist for 12 years and was licensed in Illinois and Georgia. He stated that he had a contract with the DHS to perform evaluations for sexually violent persons, which included conducting evaluations of individuals already found to be SVPs, and to prepare predisposition investigation reports and supplemental reports.

¶ 32      Dr. Gaskell testified that he received his bachelor's degree in psychology from the University of Minnesota and completed his doctoral degree from the Minnesota School of Professional Psychology. He conducted evaluations for courts while working at a Georgia hospital, and he performed SVP evaluations and gave expert testimony in Kansas courts. As part of a contract with the DHS since July 2005 to perform evaluations for sex offenders and potential SVPs, he conducted 325 evaluations for 150 sex offenders. In a clinical internship at Florida State Hospital, he conducted pretrial evaluations and risk assessments. He was an approved member of the Illinois Sex Offender Management Board for evaluations and had training in use of actuarial instruments. He noted that he had been previously qualified as an expert in clinical psychology, specifically regarding sex offender evaluation and risk assessment. At this point, Dr. Gaskell was tendered and qualified as an expert in the field, with no objection by respondent.

¶ 33      Dr. Gaskell testified that he conducted a clinical evaluation of respondent in 2007 to determine if he was a candidate for commitment under the Act. He also testified that he reviewed the respondent's master file, prior reports, and behavioral and treatment records in forming his opinion. His interview with respondent in late August 2007 lasted about 2½ hours after respondent consented to the interview in an initial meeting with him in early August 2007 that lasted about 1¼ hours. His interview was reduced to writing in a report dated September 5, 2007. He prepared a subsequent report dated February 17, 2009, based upon his review of respondent's behavioral and treatment records. He also rendered an addendum to the subsequent report (dated February 22, 2009) after conducting a psychological status examination. Prior to his testimony, he indicated he reviewed the records from the last examination on February 22, 2009, and dated up to February 14, 2011.

¶ 34      Dr. Gaskell testified about the documents and materials he considered in forming his opinion. He noted that information regarding respondent's criminal history was relevant for

---

[3]Shortly before trial, the trial court granted respondent's motion *in limine* to exclude testimony from Dr. Gaskell regarding a rescored test that he conducted. He was permitted to testify about his opinion based upon materials disclosed in discovery as of the February 14, 2011, deadline.

forming his opinion. He testified about the 2000 offense and the 2005 offense, to which respondent entered a guilty plea. He noted that both incidents involved nine-year-old male victims. Furthermore, he considered at least eight findings of juvenile delinquency, with half occurring prior to age 15 and the other half occurring after that age. He characterized the findings as four for battery, one for arson, two for damage to property, and one for a probation violation. He also discussed incidents that led to major violations for events occurring in 2010 while respondent was in DHS custody. He stated that respondent participated for one day in sex offender treatment while in custody.

¶ 35    Furthermore, Dr. Gaskell testified that he diagnosed respondent with pedophilia and antisocial personality disorder to a reasonable degree of psychological certainty, both of which made it substantially probable that respondent would commit future acts of sexual violence. He also relied upon the DSM-IV-TR in making his diagnoses. He explained that pedophilia usually began in adolescence and continued into adulthood. A pedophilia diagnosis involved a person having, over a period of at least six months, recurring, intense, sexually arousing urges, fantasies or behaviors involving sexual activity with a prepubescent child, the individual either had to have acted upon the urges or the urges themselves had to have caused the person impairment or distress, and the individual had to be at least 16 years old and at least 5 years older than the victim. He clarified that the 16-year-old age criterion was the age at the time of diagnosis and applied to respondent because his behavior began at age 15 years and 8 months and continued to the second offense, which occurred for a period over five years. Respondent's pedophilia was a congenital or acquired condition affecting respondent's emotional volitional capacity.

¶ 36    As for the antisocial personality disorder, Dr. Gaskell described the criteria as a "pervasive pattern of disregard for and violation of the rights of others" occurring since the individual was 15 years old and prior to that age. Based upon his review of the materials provided to him about respondent, Dr. Gaskell opined that the materials showed the disorder conduct manifested prior to age 15 due to his juvenile delinquency findings. He noted that respondent had four or five juvenile delinquency findings prior to age 15. As an adult, respondent had shown a failure to conform to social norms based upon his repeated acts leading to arrests over 10 times and 3 convictions. He also discussed various other criteria including deceitfulness, evidenced by repeated lying, use of aliases, and manipulating others for personal gain or pleasure. Here, he cited respondent's various aliases and birthdates, and the manipulation involved in the 2005 offense leading to his conviction. Respondent exhibited reckless disregard for the safety of others, evidenced by the 2000 and 2005 offenses, as well as several batteries and assaults on others.

¶ 37    Dr. Gaskell testified that respondent's pedophilia predisposed him to commit future acts of sexual violence, in that he had recurrent, sexual urges and fantasies to act with a child.

¶ 38    Dr. Gaskell testified about how he reached his opinion about respondent's recidivism. He stated that respondent scored in the high risk range on the two actuarial instruments used to conduct a risk assessment. He also considered other risk and protective factors to reach a total risk assessment. He utilized the Static 99 and the MnSOST-R, on both of which the respondent scored an eight. He used two instruments, because neither instrument covered all of the risk factors associated with sexual reoffending as they both had a different set of risk

factors. In addition to the risk factors covered under the actuarials, Dr. Gaskell also used the five dynamic risk factors based upon research affiliated with sex offender recidivism: sexual interest in children, antisocial personality disorder, employment instability, early onset of sexual reoffending, and separation from parents. He also considered factors that would show a decreased risk of reoffending, such as age, health status, and progress in sex offender treatment. As to respondent, none of the decreased risk factors were present, given that respondent's age was associated with the highest risk of recidivism, he had no health or medical condition that would prevent him from reoffending, and he had only been in treatment for one day. Based upon his review of the master file and all of the records, and the results of the risk assessments utilized, Dr. Gaskell opined, with a reasonable degree of psychological certainty, that respondent was substantially probable, or more likely than not, to commit future acts of sexual violence. He also opined, to a reasonable degree of psychological certainty, that respondent was dangerous due to his mental disorders that predisposed him to commit such acts.

¶ 39 On cross-examination, Dr. Gaskell clarified that respondent's pedophilia, coupled with his antisocial personality disorder, predisposed respondent to commit future acts of sexual violence. He stated that the personality disorder alone could serve as a basis for recidivism.

¶ 40                                    Respondent's Case

¶ 41 After the trial judge's admonishments to respondent, respondent indicated that he did not wish to testify. Although the State had not yet rested, respondent moved for a directed finding, arguing about the witnesses' conflicting testimony regarding which mental disorder caused the risk of reoffending and the age onset of the mental disorder (pedophilia) at issue. The trial judge denied the motion. At the end of the State's case, the State sought to enter a certified copy of respondent's 2005 conviction into evidence. During a sidebar, respondent's counsel objected to the entire document being published to the jury, because it contained the other counts for which he was not convicted. When the jury returned, the prosecutor noted to the jury, once the exhibit was admitted, that the certification established that respondent had been convicted of the sexual offense counts in 2005. The State then rested.

¶ 42 The respondent rested without presenting any witnesses or other evidence on his behalf.

¶ 43            Closing Arguments, Jury Deliberations and Commitment Order

¶ 44 Following closing arguments and the trial judge's instruction to the jury, the jury deliberated and returned a verdict finding respondent was a sexually violent person as defined by the Act. Immediately following the trial court's entry of judgment on the verdict, the State then requested entry of an order committing respondent to a secure facility for detention and treatment. Respondent's counsel objected, indicating that he had a witness he wanted to present in support of a request for conditional release and requested a predisposition evaluation be conducted. The trial judge overruled the respondent's objection and determined that he had sufficient information based upon the testimony presented at trial to enter an order committing respondent to a secure facility for treatment.

¶ 45                               Posttrial Proceedings

¶ 46        On April 22, 2011, respondent filed a posttrial motion seeking a new trial, or alternatively, to set aside the verdict and vacate the order of commitment to provide for his conditional release. The motion contended that the trial court committed various errors, including allowing the State to shift the burden improperly to him by the prosecutor's remarks about his custodial status and denying his motion for retrial after the prosecutor's improper comments that violated the orders *in limine* regarding the limited use of the experts' testimony during closing argument, and that the State failed to prove that he suffered from a mental disorder that made it substantially probable he would commit future acts of sexual violence as required by the Act. Following a hearing on June 13, 2011, the trial court denied respondent's motion. The respondent filed a timely notice of appeal with this court on July 12, 2011.

¶ 47                                  DISCUSSION

¶ 48        In the instant appeal, respondent argues that the State's improper remarks during its closing argument violated the orders *in limine* and denied him a fair trial, contends the trial court erred in denying his motion for mistrial following the State's improper remarks, challenges the sufficiency of the evidence that he was an SVP under the Act, and asserts that the trial court denied him his right to a dispositional hearing under the Act. We will address each argument in turn.

¶ 49              Propriety of Prosecutor's Remarks During Closing Argument

¶ 50        We first consider respondent's claim that the prosecutor impermissibly commented on his custodial status and argued expert testimony allowed under *Wilson v. Clark*, 84 Ill. 2d 186 (1981), as substantive evidence during its closing argument that violated orders *in limine* and deprived him of a fair trial. Before we discuss the merits of respondent's argument, however, we address the appropriate standard of review.

¶ 51        As the parties' briefs reflect, there is an apparent conflict among the districts in this court, including within our own First Distrist, regarding the applicable standard of review on this issue following our supreme court's rulings in *People v. Blue*, 189 Ill. 2d 99 (2000), and *People v. Wheeler*, 226 Ill. 2d 92 (2007). It is well established that prosecutors have wide latitude in making closing argument. *Wheeler*, 226 Ill. 2d at 123. The prosecution is allowed to comment on the evidence and draw reasonable inferences from the evidence. *In re Commitment of Kelley*, 2012 IL App (1st) 110240, ¶ 42. Prosecutorial misconduct in closing argument warrants a new trial and reversal if the improper comments were a material factor in the respondent's conviction. *Wheeler*, 226 Ill. 2d at 123. "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Wheeler*, 226 Ill. 2d at 123 (citing *People v. Linscott*, 142 Ill. 2d 22, 28 (1991)). Our supreme court has repeatedly denounced and affirmed its intolerance for prosecutorial misconduct. See *Wheeler*, 226 Ill. 2d at 121-22 (and discussion and cases cited therein).

¶ 52 In *Wheeler*, 226 Ill. 2d at 121, which respondent cites, the supreme court found that determining whether the prosecutor's remarks were so egregious as to warrant a new trial is an issue reviewed *de novo*. Although the State acknowledges *Wheeler*, the State reasons that our review of such comments is for an abuse of discretion since the ultimate determination revolves around questions of fact. The State asserts that *Wheeler* favorably cited *Blue*, which pronounced the abuse of discretion standard for reviewing a prosecutor's remarks during closing argument. See *Wheeler*, 226 Ill. 2d at 121-22. In *People v. Land*, 2011 IL App (1st) 101048, ¶¶ 148-50, the sixth division of the First District discusses various opinions, including rulings from different divisions of the First District, containing different analyses of the standard of review when considering the propriety of the prosecutor's remarks in closing argument. We need not weigh in on the disagreement, as we conclude that the State's remarks were proper under both standards. See *Land*, 2011 IL App (1st) 101048, ¶ 151.

¶ 53 Having addressed the standard of review, we now consider the specific remarks made by the prosecutor that the respondent challenges. The State argues, however, that the respondent has forfeited review of certain remarks as he failed to object at trial and raise the objections in his written posttrial motion. The law is well established that in order to preserve an issue for appeal, the party must state objections during trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). A failure to do so results in forfeiture of the claim on appeal. *Id.* Nonetheless, we consider the complained-of comments, even those remarks that were not timely objected to, made in the entire context of the closing argument. In considering respondent's claim, we focus on the remarks properly preserved for appeal. See *Wheeler*, 226 Ill. 2d at 122-23.

¶ 54 Respondent argues that the State devoted the first nine minutes of its closing argument to making improper comments, which individually or collectively, caused him undue prejudice and warrant a new trial. Respondent challenges the State's following remarks made during closing arguments:

"THE STATE [Assistant State's Attorney]: [Respondent] has been you have heard since 2007, in a department of human services facility that focuses in–

MR. COYNE [respondent's counsel]: Objection.

THE COURT: Overruled.

THE STATE: That focuses in specifically on sex offender treatment. And he has refused to participate in sex offender treatment."

¶ 55 Respondent also challenges the prosecutor's continued closing remarks that, "[y]ou heard he's had over 25 probation violations." The trial court overruled respondent's objection. This statement was made at the end of the following remarks by the State, which provide the context in which the statement was made:

"Now we all know that people can touch other people inadvertently.

But this touching was such that this little boy felt so uncomfortable that he went to his mother. And his mother was reasonable in that case. You heard that from the doctors. And said to the police, look, even though you're qualifying this as criminal sexual abuse, I will agree to have it go into the juvenile system as a battery if he gets help.

***

You heard how he continued, even after that sexual contact with the police, with this sexual offense, he continued to be in and out of juvenile detention during his juvenile years, into his adulthood. You heard how he committed cases of arson and criminal damage to property, how he possessed stolen motor vehicles. He has criminal trespass to vehicles. He's had assaults."

¶ 56     Respondent then asserts that the State concluded its remarks by stating, "[l]adies and gentlemen, just all that in and of itself before you, without an expert opinion, anyone can say there's something wrong here." While respondent's argument continues that the State commented in detail about respondent's behavior in the DHS facility, the text provides the relevant context in which the statements were made that we must consider. In particular, the prosecutor then refers to the two expert opinions proffered from psychologists whose opinions on the diagnoses were "solidified" because of respondent's behavior at the DHS facility. Clearly, the State was arguing about respondent's behavior considered by the doctors in forming their respective opinions, which was in line with *Wilson* and the orders *in limine*. Similarly, the State's remarks did not improperly shift the burden of proof to respondent, but merely summarized the bases for the expert witnesses' opinions, including how the lack of sex offender treatment was considered in their risk assessment to determine the substantial probability of respondent committing future acts of sexual violence. We also agree with the State that respondent's reliance upon *People v. Johnson*, 218 Ill. 2d 125 (2005), and *People v. Beasley*, 384 Ill. App. 3d 1039 (2008), is misplaced.

¶ 57     Respondent concedes that he failed to object to the prosecutor's comments in rebuttal, but urges us to consider them in the context of the entire argument (*Wheeler*, 226 Ill. 2d at 123) and for plain error under Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967). Yet, the State argues that because the SVP commitment proceedings are civil in nature, this court should not consider plain error under the civil forfeiture doctrine. As we have found that the prosecutor's remarks were proper and not erroneous, we also need not resolve which plain error analysis applies in the instant case. See *People v. Sargent*, 239 Ill. 2d 166, 189 (2010) (in criminal case, reviewing court must first determine if error occurred in determining applicability of plain error analysis); *Reed v. Ault*, 2012 IL App (2d) 110744, ¶ 33 (same for civil appeal); see also *In re Commitment of Curtner*, 2012 IL App (4th) 110820, ¶¶ 26-27 (briefly discussing application of plain error doctrine in proceedings under the Act).

¶ 58     Additionally, we do not find that the prosecutor's remarks violated the orders *in limine*. We review the judge's ruling for an abuse of discretion. *Kelley*, 2012 IL App (1st) 110240, ¶ 33. An abuse of discretion occurs where the ruling is arbitrary, fanciful, or so unreasonable that the opposite conclusion is obvious. *Id*. The State's comments regarding respondent's custodial status and the expert witnesses' conclusions did not clearly violate the orders *in limine*.

¶ 59                                   Motion for Mistrial

¶ 60     The respondent argues that the trial judge abused his discretion in denying his motion for mistrial due to the prosecutorial remarks during closing argument as discussed previously

herein. We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). "A trial court abuses its discretion when its decision is 'fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it.' " *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 32 (quoting *People v. Ortega*, 209 Ill. 2d 354, 359 (2004)); *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 609 (2007). As we have concluded that the prosecutor's comments were not improper and did not warrant a new trial, we similarly conclude that the trial judge did not abuse his discretion when he denied respondent's motion based upon the comments.

¶ 61                                        Sufficiency of the Evidence

¶ 62        Next, respondent contends that the State failed to prove beyond a reasonable doubt that he was an SVP as defined by the Act. When reviewing claims challenging the sufficiency of the evidence, we consider whether any rational trier of fact would have found the evidence, drawing all reasonable inferences in the State's favor, established the elements of the offense. *Lieberman*, 379 Ill. App. 3d at 598. When considering such claims, the reviewing court does not retry the respondent, as the trier of fact (the jury in this instance) was in the best position to weigh evidence and assess the credibility of the testimony and evidence presented at trial. *Wheeler*, 226 Ill. 2d at 114-15.

¶ 63        In order to establish that respondent was an SVP under the Act, the State had to show that he was a person convicted of a sexual offense, he had a mental disorder, and he was dangerous to others because his mental disorder created a substantial probability that he would engage in acts of sexual violence. 725 ILCS 207/5(f), 15(b)(1)(A), (b)(4), (b)(5) (West 2010). At trial, the State had the burden of proving beyond a reasonable doubt the above criteria. 725 ILCS 207/35(d)(1) (West 2010). Respondent does not dispute that the State established the first criterion–that he was convicted of a sexually violent offense. Rather, respondent asserts that the State failed to establish the second and third criteria.

¶ 64        Respondent maintains that because the State's expert witnesses' testimony about the mental disorder that he was diagnosed with–pedophilia–conflicted with the DSM-IV-TR, the State failed to show that respondent had a mental disorder. In particular, respondent asserts that the State's experts diagnosis conflicted with the manual, because the onset age differed from that in the manual. Notably, both Dr. Leavitt and Dr. Gaskell initially stated that respondent met the criteria for pedophilia, because of the onset age of 16 as reflected in the manual. Yet, they discovered after their evaluation that the respondent was actually 15 years old and 8 months when he committed the first offense that they considered in forming their opinions.

¶ 65        Additionally, respondent maintains that the State's experts contradicted each other to the extent that one expert testified that respondent's pedophilia alone created the substantial probability of recidivism, whereas the other indicated that his pedophilia and the antisocial personality disorder created the substantial probability that he would commit future acts of sexual violence. While respondent insists that his argument does not attack the credibility of the witnesses, we disagree. The jury, as the trier of fact, was free to determine the credibility of the State's witnesses in considering whether the State proffered sufficient evidence to

-15-

show that respondent suffered from a mental disorder. The jury's findings regarding credibility are accorded great weight. *Wheeler*, 226 Ill. 2d at 115. As the record contains sufficient, uncontroverted testimony from the State's witnesses that respondent suffered from a mental disorder of pedophilia, we reject respondent's argument.

¶ 66    Furthermore, respondent asserts that the State failed to prove the third element–that the mental disorder created a substantial probability that he would commit future acts of violence. For purposes of the Act, substantial probability is defined as "more likely than not." (Internal quotation marks omitted.) *In re Detention of Bailey*, 317 Ill. App. 3d 1072, 1086 (2000). In particular, respondent challenges the experts' use of the actuarial instruments in making their diagnosis, claiming that the instruments were not reliable sources in the field. Again, we find respondent's arguments attack the credibility of the witnesses' testimony. As we previously stated, the jury, as the trier of fact, was free to assess credibility of the witnesses' testimony about why they utilized certain actuarial instruments. *Wheeler*, 226 Ill. 2d at 114-15. Respondent's counsel vigorously cross-examined the witnesses about the reliability of the actuarial instruments, how they scored respondent based upon the actuarial tools, and the ultimate conclusion reached about the respondent's high risk of reoffending. Both also testified that they considered dynamic factors, along with the actuarial instruments used, in forming their opinions. The jury was free to consider their testimony and assess the appropriate credibility of their testimony. Apparently, the jury found their unrefuted testimony credible as it returned a verdict in the State's favor finding that these two elements, along with the first regarding the underlying conviction for a sexual offense, had been proven beyond a reasonable doubt. Accordingly, respondent's challenge to the sufficiency of the evidence against him fails.

¶ 67                    Dispositional Hearing

¶ 68    Finally, we consider respondent's claim that the trial judge denied him a dispositional hearing as mandated by the Act (725 ILCS 207/40(b)(1) (West 2010)) before entering the commitment order. Alternatively, he argues that the trial court failed to conduct a "meaningful" disposition hearing following the entry of a judgment on the jury's verdict finding him to be an SVP. As respondent's claim presents a question of statutory interpretation, our review is *de novo*. *People v. Gutman*, 2011 IL 110338, ¶ 12; *Taddeo v. Board of Trustees of the Illinois Municipal Retirement Fund*, 216 Ill. 2d 590, 595 (2005). The primary objective in construing a statute is to ascertain and effectuate the intent of the legislature, best accomplished by viewing the statute's plain and ordinary language. *People v. Amigon*, 239 Ill. 2d 71, 84-85 (2010). The statute is considered as a whole, with words and phrases considered in light of other statutory provisions; each word and phrase is given its reasonable meaning and not considered superfluous. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 279-80 (2003). "We may not depart from the statute's plain language by reading in exceptions, limitations, or conditions that conflict with the legislature's intent." *Amigon*, 239 Ill. 2d at 85. Furthermore, we do not construe a statutory provision to intend absurd, inconvenient, or unjust results. *People v. Christopherson*, 231 Ill. 2d 449, 454 (2008).

¶ 69    The provision regarding dispositional hearings under the Act provides in relevant part:

-16-

"The court shall enter an initial commitment order under this Section pursuant to a hearing held as soon as practicable after the judgment is entered that the person *** is a sexually violent person. If the court lacks sufficient information to make the determination required by paragraph (b)(2) of this Section immediately after trial, it may adjourn the hearing and order the Department [of Human Services] to conduct a predisposition investigation or a supplementary mental examination, or both, to assist the court in framing the commitment order." 725 ILCS 207/40(b)(1) (West 2010).

Immediately after entering the judgment on the jury's verdict finding respondent was an SVP under the Act, the trial judge asked respondent's counsel, "what's next?" Respondent's counsel responded that "I believe we have to select a date." The State then moved for immediate entry of an order committing respondent to institutional care and treatment in a secure DHS facility. Respondent's counsel objected, indicating that he wished to present certain evidence that had not been adduced at trial. In overruling the objection, the trial judge stated:

"Based on the evidence that I heard from the two expert witnesses, about the substantial background and pattern of behavior, I believe I am allowed statutorily to find that he now be sent for treatment. That's what I am ordering, that he go to the [treatment and detention facility] for treatment pursuant to statute."

Further, respondent points to the trial judge's continued comments following respondent's objection:

"If we have a dispositional hearing. I think pursuant to statute I'm entitled at this stage based on what I heard, to make that determination independently. So that's what I am going to rule."

¶ 70    Respondent maintains that the Act required a hearing that enabled him to present additional evidence and testimony before the commitment order was entered. Respondent argues that the proceeding was necessary, because he could not present evidence against commitment or for conditional release in his case-in-chief as he would be admitting that he was an SVP. He also insists that the trial judge's commitment order here was entered without considering the criteria set forth in section 40(b)(2) of the Act (725 ILCS 207/40(b)(2) (West 2010)). Section 40(b)(2) of the Act provides, in relevant part:

"In determining whether commitment shall be for institutional care in a secure facility or for conditional release, the court shall consider the nature and circumstance of the behavior that was the basis of the allegation in the petition***, the person's mental history and present mental condition, *** and what arrangements are available to ensure that the person has access to and will participate in necessary treatment." 725 ILCS 207/40(b)(2) (West 2010).

¶ 71    Respondent correctly notes that this statutory question presents an issue of first impression for the First District of this court. In support of his contention that the Act requires a separate dispositional hearing, respondent cites the Third District's ruling in *People v. Winterhalter*, 313 Ill. App. 3d 972 (2000). He also provides the dictionary definitions of selected words, such as "shall," "hearing," and "pursuant," contained in section

-17-

40(b) of the Act to buttress his argument. While noting a contrary ruling was issued by the Second District of this court in *In re Detention of Tittlebach*, 324 Ill. App. 3d 6 (2001), respondent argues *Tittlebach* was wrongly decided, because the *Tittlebach* court failed to comply with statutory interpretation rules, including ignoring language in section (40)(b)(1) of the Act by considering language in the preceding section (see 725 ILCS 207/40(a) (West 2010)).

¶ 72    The State, on the other hand, describes the conflict in rulings as "illusory," agrees that the statute requires a hearing in entering the commitment order, and frames the germane issue as whether the provision vests the trial court with discretion over the *scope* of hearing.[4] We need not determine whether *Tittlebach* was decided wrongly, which we do not, as we review this question of law *de novo*. *Gutman*, 2011 IL 110338, ¶ 12. Additionally, we are not bound by the decisions of other appellate districts (*O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008)) or the trial court's implied interpretation as part of our *de novo* review (see *Hartz Construction Co. v. Village of Western Springs*, 2012 IL App (1st) 103108, ¶ 23 (*de novo* review involves examining evidence unconstrained by the trial court's reasoning)).

¶ 73    Guided by well-established statutory interpretation rules, we hold that the Act's plain language requires the trial court to conduct a hearing before entering the commitment order. 725 ILCS 207/40(b)(1) (West 2010). Similarly, we construe the Act as granting the trial court discretion not to adjourn the proceedings where the court believes neither a supplemental examination nor a predisposition investigation is required in framing its commitment order. 725 ILCS 207/40(b)(1) (West 2010). Continuation of a hearing lies within the trial court's discretion. *People v. Weeks*, 2011 IL App (1st) 100395, ¶ 30; *Somers v. Quinn*, 373 Ill. App. 3d 87, 96 (2007). However, we find that the language in the Act does not allow the trial court to deny a respondent his right to present evidence and testimony addressing the factors set forth in section 40(b)(2) of the Act (725 ILCS 207/40(b)(2) (West 2010)) or in mitigation of commitment to a secure facility during the dispositional phase.

¶ 74    In the case *sub judice*, the trial court proceeded with an immediate dispositional hearing following the entry of a judgment on the jury's verdict, despite respondent's request to

---

[4]At the end of its response brief, the State baldly asserts that even if the trial court failed to conduct a dispositonal hearing, any such failure should be considered harmless error. Without elaborating on and citing to authority in support of this argument, the point is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008); *Walters v. Rodriguez*, 2011 IL App (1st) 103488, ¶¶ 5-6.
    However, the State contends, in a petition for rehearing, that this court overlooked the authority cited for its assertion. While we acknowledge that the State cited *Tittlebach*, 324 Ill. App. 3d at 12-13, and *Winterhalter*, 313 Ill. App. 3d at 980, prior to its conclusory statement, we note that the *Winterhalter* and *Tittlebach* courts did not find that the trial courts erred at all or even applied harmless error analysis in how the courts proceeded with the dispositional phase following the SVP verdicts and judgments thereon. As we concluded that the trial court erred in the manner in which it proceeded with the dispositional hearing based upon the record before us (see ¶¶ 73-74 herein), we find the State's reliance on the cases for this point is misplaced.

schedule a hearing to allow him to present a witness and have a predisposition evaluation conducted before the commitment order was entered. Even if the trial court determined that a predisposition evaluation was unnecessary, the trial court erred and did not comply with the language in the Act when it failed to hold an immediate hearing or adjourn the proceedings to afford respondent the opportunity to present testimony to address the factors outlined in section 40(b)(2) of the Act before the commitment order was entered. Unlike the respondents in *Winterhalter* and *Tittlebach*, respondent here indicated that he wished to present testimony for the trial court's consideration regarding the appropriate disposition. See *Tittlebach*, 324 Ill. App. 3d at 12; *Winterhalter*, 313 Ill. App. 3d at 981. Simply put, holding an immediate hearing or continuing the hearing to allow respondent to proffer additional evidence and testimony would have served the interests of justice, namely, framing the appropriate commitment order following the SVP finding. *People ex rel. Reid v. Adkins*, 48 Ill. 2d 402, 406 (1971).

¶ 75    The State insists that respondent's counsel should have been prepared to present any additional testimony or evidence at dispositional hearing immediately after trial as the trial dates were set. While the trial dates may have been set, respondent was not required to present any evidence during trial as he was presumed innocent and the State had the burden of proof during trial. 725 ILCS 207/35(d)(1) (West 2010); but see *Tittlebach*, 324 Ill. App. 3d at 9 (during bench trial, respondent introduced testimony from doctor that addressed element of substantial probability of reoffending); *Winterhalter*, 313 Ill. App. 3d at 975 (during trial, psychiatrist testified for respondent that he was unlikely to commit future acts of sexual violence). Thus, respondent did not have to prepare a witness for a dispositional hearing that may not have occurred. Additionally, the Act provides for the initial commitment order to be entered "pursuant to a hearing held *as soon as practicable after the judgment is entered* that the person *** is a sexually violent person." (Emphasis added.) 725 ILCS 207/40(b)(1) (West 2010). "As soon as practicable" does not necessarily mean that the hearing had to occur immediately after trial. Adjourning the proceedings, even if for a day, would have been practicable to allow introduction of additional testimony or evidence for the trial judge's consideration in framing the commitment order. Since respondent was ordered detained in a secure DHS facility pending the proceedings, there was no danger that respondent would be released before the dispositional hearing concluded.

¶ 76    In its petition for rehearing, the State also urges us to reconsider our finding regarding respondent's claim about the dispositional hearing conducted following the trial court's judgment on the jury's verdict finding him to be an SVP. From the outset, we note, and the State acknowledges, that its citation to an unpublished order in this court lacks precedential value as Illinois Supreme Court Rule 23(e)(1) (eff. July 1, 2011) expressly provides that "[a]n order entered under *** this rule is not precedential and may not be cited by any party." See also *People v. Powell*, 2012 IL App (1st) 102363, ¶ 14 n.3; *Voris v. Voris*, 2011 IL App (1st) 103814, ¶ 17. However, a party can cite to such an order "to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." Ill. S. Ct. R. 23(e)(1) (eff. July 1, 2011). According to the State, the unpublished order involves "nearly identical facts" to those presented in the instant appeal, the same trial court judge, and the same trial counsel who represented respondent there also represents the respondent here, in bolstering

its argument that we consider the unpublished order's analysis and conclusion. However, the law of the case doctrine would bind us to the ruling where the same issue *and* identical parties were before this court. See, *e.g.*, *People v. Young*, 263 Ill. App. 3d 627, 633 (1994). While the issue regarding the dispositional hearing presented in the appeals is the same, the separate cases involve different respondents; thus, we are not bound by the ruling of the unpublished order cited by the State.

¶ 77 Additionally, the State requests that we clarify our ruling concerning dispositional hearings conducted under the Act as the bases for our decision "will lead to confusion regarding the timing and scope of dispositional hearings within the [First] District." In support of its assertion, the State quotes from this court's opinion finding that the "trial court erred and did not comply with the language in the Act when it failed to hold an immediate hearing or adjourn the proceedings." *Supra* ¶ 74. Yet, the State overlooks the remainder of the sentence to provide the full context of our finding that "[e]ven if the trial court determined that a predisposition evaluation was unnecessary, the trial court erred and did not comply with the language in the Act when it failed to hold an immediate hearing or adjourn the proceedings to afford respondent the opportunity to present testimony to address the factors outlined in section 40(b)(2) of the Act before the commitment order was entered." *Id*. Contrary to the State's assertion, this finding does not force a trial court to order a supplemental evaluation. As we previously stated, we interpret the relevant statutory provision as granting a trial court discretion to proceed without ordering a preliminary examination in framing its commitment order. *Supra* ¶ 73. Our finding relates to a disposition hearing that does not afford the respondent the opportunity to present other testimony or evidence regarding disposition, *i.e.*, testimony or evidence in favor of conditional release versus detention in a secure facility. *Id*.

¶ 78 Similarly, our finding does not aggravate the practical consequences of timely conducting dispositional hearings, entering commitment orders, or scheduling subsequent examinations to frustrate the purposes of the Act. Particularly, we disagree that our finding would create "lengthy continuances" or undue delays. As most parties, namely, the State and respondents' attorneys, will be familiar with the Act and proceedings thereunder, judicial economy and the timely administration of justice can be met in the planning of witnesses in the event of an immediate dispositional hearing following entry of judgment on the jury's verdict. Likewise, a trial court can adjourn the proceedings to conduct or schedule a dispositional hearing to afford the respondent the opportunity to present and prepare any witnesses in an expeditious manner and avoid undue delay in framing and entering the appropriate commitment order. Notwithstanding the State's implication, the two concepts are not mutually exclusive.

¶ 79 CONCLUSION

¶ 80 In sum, we conclude that the challenged remarks by the prosecutor during closing argument, including allegedly arguing testimony from expert witnesses as substantive evidence in violation of *Wilson v. Clark*, 84 Ill. 2d 186 (1981), were proper and did not violate orders *in limine* or improperly shift the burden of proof to respondent to warrant a

new trial. Consequently, we also conclude that the trial court did not abuse its discretion in denying respondent's motion for a mistrial based upon the allegedly improper comments. Further, we find that the State proved beyond a reasonable doubt that respondent was an SVP as defined by the Act. However, we conclude, based upon our interpretation and construction of the Act, that the trial court erred by not holding a hearing to afford respondent the opportunity to introduce testimony and evidence as part of the dispositional phase. Accordingly, we vacate the commitment order and remand the cause to the circuit court to conduct a dispositional hearing allowing respondent to present evidence and testimony for the trial judge's consideration in framing its commitment order in accordance with section 40(b)(2) of the Act (725 ILCS 207/40(b)(2) (West 2010)).

¶ 81      Affirmed in part and vacated in part; cause remanded.