2025 IL App (1st) 231931-U

No. 1-23-1931

Order filed July 30, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF GWENN HALE | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
|    Petitioner-Appellee, | ) | |
| | ) | |
|   v. | ) | No. 14 CR 80001 |
| | ) | |
| Gwenn Hale, | ) | Honorable |
| | ) | James B. Novy, |
|    Respondent-Appellant.) | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err when it declared respondent a sexually violent person under the Sexually Violent Persons Commitment Act and ordered him committed to a secure treatment and detention facility.

¶ 2    Following a jury trial, the trial court declared that respondent Gwenn Hale, a convicted sex

offender, was a sexually violent person under the Sexually Violent Persons Commitment Act (Act)

(725 ILCS 207/1 *et seq.* (West 2022)), and ordered him committed to a secure treatment and detention facility (TDF).

¶ 3       On appeal, respondent argues that the State (1) failed to prove that he is a sexually violent person (SVP), and (2) committed prosecutorial misconduct during closing arguments.

¶ 4       For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                                    I. BACKGROUND

¶ 6       In 2014, as respondent neared the completion of his sentence for his 1993 offenses of aggravated criminal sexual assault, the State petitioned for his commitment under the Act.

¶ 7       At respondent's jury trial in July 2023, the State submitted a certified record of conviction as proof of respondent's sexually violent offenses: four separate convictions for aggravated criminal sexual assault. The State also presented two experts in sex offender evaluation, diagnosis, and risk assessment: Dr. Angeline Stanislaus and Dr. Lindsay Dees. Each prepared written reports, which were admitted into evidence at trial. Both experts opined that respondent is dangerous because he suffers from a mental disorder that makes him substantially probable to engage in future acts of sexual violence. Respondent called Dr. Deborah Nicolai, who testified that respondent is not an SVP.

¶ 8       In reaching their opinions, Drs. Stanislaus and Dees relied on information contained in, among other things, respondent's Illinois Department of Corrections (IDOC) master file (including court records and police reports) and his medical and disciplinary records from his time in the custody of IDOC and the Illinois Department of Human Services (DHS).

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 9   Dr. Stanislaus prepared an initial report in 2014, and though respondent initially refused to participate in an interview with Stanislaus, he ultimately consented to a clinical interview in December 2021, and Stanislaus updated her report in January 2022 following that interview. Dr. Dees prepared her report in October 2022, following respondent's refusal to participate in an interview with her.  Stanislaus and Dees also reviewed updated DHS medical records before testifying.

¶ 10   Dr. Stanislaus testified that she relied on respondent's behavioral history in reaching her opinion that he is an SVP.  Specifically, she considered respondent's sexually violent record, which began in 1982 when he was convicted of indecent solicitation of a child, two counts of deviate sexual assault, and two counts of armed violence for repeatedly raping an 11-year-old boy.  At the time, respondent was a Boy Scout troop leader and invited the 11-year-old troop member to his apartment to try on a uniform.  When the boy arrived, respondent threatened the boy with a gun before anally raping and engaging in oral sex with him.  A few weeks later, respondent found the same boy in the public library, brought him to his apartment, and anally raped him again.  Respondent was sentenced to 16 years in prison but released on parole in 1989.

¶ 11   In 1993, respondent was charged in eight separate cases for offenses against boys between the ages of 9 and 13 years old.  Respondent went to trial in four of the cases, was convicted in each of aggravated criminal sexual assault, and was sentenced to 40 years in prison.  In the first case, respondent brought a nine-year-old boy, Nathaniel, to his house; gave him food, money, and cigarettes; and engaged in oral sex with the boy.  Nathaniel reported that there were other young boys in the house who witnessed these acts, and respondent would also engage in sex with his

adult roommate in front of the boys. These offenses occurred in 1990, while respondent was on parole for his 1982 conviction.

¶ 12    Nathaniel's 12-year-old brother, Quentin, similarly reported that respondent gave him money, food, and cigarettes and performed oral sex on him approximately 15 times between 1992 and 1993. A third boy, James, stated that he went to respondent's apartment multiple times between 1992 and 1993, where respondent tutored him and gave him an allowance. Respondent performed oral sex on James, who was 12 years old, approximately 40 times. When investigating officers arrived at respondent's home in 1993, they found James in the house wearing only his underwear. Finally, Earl, who was 12 years old, reported that respondent molested him over a period of three to four months in 1993.

¶ 13    Stanislaus testified that, after respondent was arrested for molesting James, respondent told police that he ran a tutoring center out of his apartment and used the center to tutor, feed, and wash poor young boys at his apartment. Respondent claimed that two of the boys held him down while James put his penis into respondent's mouth. Respondent initially "resisted" but was forced to perform oral sex on James and ultimately "helped" James have his first ejaculation. Similarly, respondent told officers that he was held down by other boys when Earl placed his penis in respondent's mouth. Respondent also told police that there were two other 12-year-old boys who came to his apartment and forced him to perform oral sex on them while other boys held respondent down. Respondent said he "should have resisted" but admitted that he "liked it as well."

¶ 14    Stanislaus also considered respondent's nonsexual criminal history, which included convictions for negligent homicide/reckless conduct and unlawful use of a weapon, as well as additional arrests for aggravated battery and unlawful use of a weapon. Finally, Stanislaus

considered respondent's conduct while in custody. Specifically, respondent had "several fights and staff assaults" while in IDOC custody, including a 2004 aggravated battery charge for assaulting prison staff. Respondent also had multiple violations between 2014 and 2021 while in DHS custody.

¶ 15    Based on all this information, Stanislaus diagnosed respondent with (1) pedophilic disorder, sexually attracted to males, and (2) antisocial personality disorder. Regarding the pedophilic disorder diagnosis, Stanislaus explained that respondent repeatedly sought out opportunities that gave him access to and "create[d] an opportunity to be around" young boys. Respondent, like other individuals who are sexually attracted to children, "[chose] occupations or opportunities or hobbies" that gave him access to children and allowed him to repeatedly act on his "deviant sexual interest in" children. As a Boy Scout leader and tutor, respondent occupied a leadership role over the young boys, "created [situations] where young boys were coming to his house," and provided them a monthly allowance to "keep [them] coming." Stanislaus testified that respondent's pedophilic disorder is a lifelong, congenital or acquired condition that affects his capacity to control his sexual behavior and predisposes him to commit acts of sexual violence; indeed, respondent had acted out on his urges by repeatedly molesting children despite knowing that he would get into legal trouble. Stanislaus opined that respondent continues to suffer from the disorder, as demonstrated by his admission to Stanislaus that he masturbates to thoughts of young boys.

¶ 16    As to the antisocial personality disorder diagnosis, Stanislaus explained that respondent repeatedly got into legal trouble during a 30-year period, was unable to maintain a "stable job or lifestyle," and exhibited anger, grievances, and hostility, which are all indicative of antisocial

personality disorder. Stanislaus explained that antisocial personality disorder "exists throughout a person's life," and makes respondent "much more likely" to act on his "deviant sexual interest."

¶ 17    Stanislaus performed a risk assessment to determine respondent's likelihood of sexually reoffending, which included the administration of actuarial instruments and analysis of research-based dynamic and protective risk factors. Respondent's score of 4 on the Static-99R placed him in the "average" risk category, but his risk was elevated by multiple dynamic risk factors, including (1) sexual preference for children, (2) "offensive supportive" attitudes, namely respondent's belief that his victims benefitted from the sexual interactions, (3) lack of emotionally intimate relationships with adults, (4) hostility or negative emotionality as indicated by his anger, fighting, and insolence while in custody, (5) lack of self-regulation skills, as shown by his inability to maintain a stable job or lifestyle, (6) impulsivity and recklessness, as shown by his repeated legal troubles, and (7) problems with supervision, as demonstrated by his offenses while on parole. Stanislaus found no protective factors that reduced respondent's risk: he was not of advanced age, had not completed sex offender treatment, and did not have a permanent or debilitating medical condition although he was in a wheelchair and exhibited occasional tremors at trial.

¶ 18    Based on all the information, Stanislaus concluded to a reasonable degree of psychiatric certainty that respondent is an SVP because his pedophilic disorder predisposes him to engage in continued acts of sexual violence and he is "[m]uch more likely than not" to engage in future acts of sexual violence.

¶ 19    On cross-examination, Stanislaus stated that she added one point to defendant's Static-99R score for lack of a cohabiting relationship for two years but she did not ask respondent about his relationships. Also, the day before Stanislaus testified, she noted that she had miscalculated a point she

added to respondent's Static-99R score for four or more sentencing dates even though respondent had only three sentencing dates. However, Stanislaus also missed a prior sexual conviction, and that added a point. So, she opined that respondent still scored a 4 on the Static-99R. But even if he had been a 3, Stanislaus stated that her conclusion in this case would not change.

¶ 20    Dr. Dees also evaluated respondent and opined that he is an SVP. Like Stanislaus, Dees relied on respondent's behavioral patterns, including his 1982 rape of an 11-year-old boy at gunpoint, 1993 repeated oral sexual assaults on young boys, and disciplinary history while in IDOC and DHS custody. Dees noted that (1) between 1990 and 1993, respondent demonstrated a "significant pattern" of "inviting young boys to his apartment where he was orally assaulting them" even after he had been previously convicted for violently assaulting an 11-year-old boy in 1982, and (2) these boys, when interviewed by police, stated that respondent would give them food, money, and candy to commit his offenses.

¶ 21    Dees diagnosed respondent with (1) pedophilic disorder, nonexclusive type, sexually attracted to males, and (2) antisocial personality disorder with paranoid and histrionic traits. Respondent exhibited a "pattern of offending" against "young males age 13 and younger," contributing to Dees' pedophilic disorder diagnosis. Like Stanislaus, Dees opined that respondent continues to suffer from pedophilic disorder, which "does not spontaneously remit" without "some type of treatment or intervention," so that an individual with untreated pedophilic disorder will "continue to have that sexual urge towards children." Respondent had not participated in any sex offender treatment and had recently reported that he continued to have erotic thoughts about young boys.

¶ 22    Dees based respondent's antisocial personality disorder diagnosis on his irritability, aggressiveness, sexual behavior, history of impulsiveness, and "pervasive pattern" of "disregarding and violating the rights of others." Respondent demonstrates paranoid traits because he has consistently exhibited "persecutory ideation" and the feeling that "others are out to get him, [and] he's being treated unfairly." Respondent's histrionic trait is based on his emotional dysregulation and volatility. Dees opined that respondent continues to suffer from antisocial personality disorder because he is "still getting rule infractions in the TDF," is "still very irritable," continues to get into "verbal altercations and becomes defensive very easily," and has not received any treatment for the disorder.

¶ 23    Dees opined that both of respondent's disorders predispose him to engage in acts of sexual violence. Each of respondent's disorders, alone, impacts his ability to refrain from acting on his urges, but "when combined, [respondent's] antisocial personality disorder basically drives the pedophilia" by reducing his inhibition to act on his sexual urges and "natural disregard" for the rights of others.

¶ 24    Dees also concluded that respondent's disorders make him substantially probable to engage in future acts of sexual violence. Respondent's scores on the Static-99R and Static-2002R fell within the "average" risk categories, but underestimated respondent's risk because there are "many, many, many sex offenses that go undetected." In addition, six empirical risk factors increase respondent's overall risk: (1) significant social influences, (2) impulsivity, (3) poor problem-solving skills, (4) negative emotionality, (5) deviate sexual arousal, and (6) lack of cooperation with supervision. On cross-examination, Dees conceded that she had previously erred when calculating respondent's scores on the Static-99R but affirmed that he scored within the

"average" risk category when the errors were corrected. Specifically, she erred by adding a point for respondent not living with a significant other for two years even though that issue was unknown. Dees also underscored respondent's prior sex offenses as two points instead of three points.

¶ 25    Dees opined that age was the only protective factor that applied to respondent, but that it did not further mitigate his risk of reoffending because it was accounted for in the actuarial scores. Based on all this information, Dees concluded to a reasonable degree of psychological certainty that respondent is substantially probable, or "much more likely than not," to engage in future acts of sexual violence.

¶ 26    Respondent presented Dr. Nicolai's opinion that respondent is not an SVP because he does not suffer from a mental disorder that is a congenital or acquired condition affecting the emotional or volitional capacity predisposing him to engage in acts of sexual violence. According to Nicolai, although respondent performed oral sex more than 87 times on boys between the ages of 11 and 13 years old between 1992 and 1993, he does not suffer from pedophilic disorder because his offenses were "very dissimilar" and thus revealed no "pattern of sexually offending against prepubescent boys." Moreover, it was "too difficult" to diagnose respondent with pedophilic disorder, sexually attracted to males, because the boys told each other to go to respondent's house and, consequently, she "couldn't definitively say that [respondent] was seeking out this, like as a sexual preference." Nicolai conceded, however, that it "certainly would change [her] mind" if she learned that respondent had stated as recently as 2021 that he still masturbates to thoughts of children, and that respondent told Stanislaus in 2021 that he still at that time had erotic thoughts about "young boys." Finally, Nicolai did not diagnose respondent with paraphilic disorder,

sexually aroused by force, because respondent did not use force during any of the offenses between 1990 and 1993.

¶ 27    As for respondent's risk of reoffending, Nicolai scored respondent in the "average" risk categories on both the Static-99R and Static-2002R. Although she considered dynamic risk factors that would increase respondent's risk, she never explained the factors she considered or why they did not elevate respondent's risk. Nicolai found no protective factors that mitigated respondent's risk. Ultimately, she noted that respondent would need to engage in sex offender treatment for him to meaningfully change his behaviors.

¶ 28    The jury found beyond a reasonable doubt that respondent is an SVP.

¶ 29    Respondent moved for a new trial on various grounds, including, as relevant here, that (1) the State failed to prove respondent is an SVP beyond a reasonable doubt and (2) the trial court erred in overruling respondent's objection to the prosecutor's statement that counsel did not want the jury to "get taken in by the idea that these young boys were somehow complicit" in respondent's offenses. The trial court denied the motion.

¶ 30    Following a dispositional hearing, the trial court ordered respondent's commitment to secure care.

¶ 31    Respondent appealed.

¶ 32                                II. ANALYSIS

¶ 33                          A. Sufficiency of the Evidence

¶ 34    Respondent argues that the State failed to prove beyond a reasonable doubt that he is an SVP. Specifically, he argues that the State failed to prove that he currently suffers from a mental disorder that makes it substantially probable that he will engage in future acts of sexual violence

because the State failed to prove any causal link between his mental disorder and his likelihood to reoffend. Furthermore, even if a causal link exists between his mental disorder and his likelihood to reoffend, it does not rise to a substantial probability.

¶ 35    "When reviewing claims challenging the sufficiency of the evidence, [the court] consider[s] whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt." *In re Commitment of Fields*, 2014 IL 115542, ¶ 20.  A reviewing court will not reverse a jury's SVP finding unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt, for "[i]t is not the role of the reviewing court to substitute its judgment for that of the trier of fact regarding the credibility of the witnesses or the weight to be given the evidence." *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 56.

¶ 36    The trial evidence sufficed to prove that respondent is an SVP.  To prove that respondent is an SVP, the State was required to prove that "(1) respondent was convicted of a sexually violent offense, (2) he has a mental disorder, and (3) the mental disorder makes it substantially probable that he will engage in acts of sexual violence." *Fields*, 2014 IL 115542, ¶ 20; 725 ILCS 207/5(f) (West 2022).

¶ 37    It is undisputed that respondent was convicted of a sexually violent offense, and he concedes that he suffers from a qualifying mental disorder.  Respondent's sole contention that the evidence was insufficient to show the third element beyond a reasonable doubt fails because both Drs. Stanislaus and Dees performed a comprehensive sex offender risk assessment—weighing respondent's actuarial scores, the dynamic risk factors elevating his risk, and the absence of protective factors that might mitigate risk, including his failure to complete sex offender

treatment—and concluded that respondent is substantially probable to commit future acts of sexual violence. Viewing that expert evidence in the light most favorable to the State, a reasonable juror could find that the State proved this element beyond a reasonable doubt. See *Fields*, 2014 IL 115542, ¶ 20; *In re Commitment of Stevens*, 345 Ill. App. 3d 1050, 1063 (2004) (evidence sufficed to show that respondent was substantially probable to reoffend where the State's experts reached a conclusion based on clinical diagnoses and actuarial instruments); *White*, 2016 IL App (1st) 151187, ¶¶ 54-64 (same where the defense expert disagreed with two State experts who testified that respondent was substantially probable to sexually reoffend).

¶ 38    Drs. Stanislaus and Dees each scored respondent in the "average" risk category on the Static-99R, and Dees also scored him in the "average" risk category on the Static-2002R. But neither expert relied solely on the actuarial scores in reaching their professional opinions. Rather, Dees explained that the actuarial tools underestimate respondent's risk of sexually reoffending because they fail to capture offenses that do not result in legal action, and both experts testified that respondent's risk of sexually reoffending was elevated by multiple dynamic risk factors.

¶ 39    For instance, both experts testified that respondent's dynamic risk factors included impulsivity, problems with supervision, and negative emotionality. Stanislaus determined that respondent also exhibited dynamic risk factors for sexual preference for children, offensive supportive attitudes, lack of emotionally intimate relationships with adults, and lack of self-regulation skills; and Dees found that respondent's additional risk factors included his lack of any positive relationships with others, poor problem-solving skills, and deviate sexual arousal. Moreover, neither expert found any protective factors that would further reduce respondent's risk. Accordingly, based on respondent's actuarial scores, dynamic risk factors, and lack of protective

factors, both experts testified to their opinions that respondent is substantially probable to commit future acts of sexual violence. In sum, when properly viewed in the light most favorable to the State, the State's expert testimony sufficed to establish that respondent is substantially likely to sexually reoffend, and respondent's sufficiency claim fails.

¶ 40    Respondent argues that the evidence is insufficient because the State's experts "failed to link" respondent's mental disorder "with a substantial probability that he would reoffend." This argument lacks merit. As this court has repeatedly held, the Act "do[es] not require any specific, precise, or exact testimony to find that an expert sufficiently made the connection between respondent's mental condition and risk of reoffense." *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 76; see, *e.g.*, *In re Commitment of Montilla*, 2022 IL App (1st) 200913, ¶ 120; *In re Commitment of Evans*, 2021 IL App (1st) 192290, ¶¶ 68-72; *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 64; *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶¶ 45, 50. Rather, the evidence sufficed because both experts "testified about the requirements of the SVP Act and concluded that [respondent] met them. They also opined that his mental disorder makes him substantially probable to engage in acts of sexual violence." *Evans*, 2021 IL App (1st) 192293, ¶ 72. Accordingly, "[a]s in *Gavin*, *Montanez*, and *Moody*, the experts' testimony, when viewed in context, plainly linked [respondent]'s substantial probability to reoffend to his mental disorder[s]." *Id*.

¶ 41    More specifically, both Drs. Stanislaus and Dees explained that respondent's pedophilic disorder makes him substantially probable to reoffend. Stanislaus opined that respondent's pedophilic disorder affects his capacity to control his sexual behavior and predisposes him to commit acts of sexual violence, as indicated by his continued molestation of children even after

he was convicted for violently raping an 11-year-old boy. Dees similarly linked respondent's likelihood to reoffend to his pedophilic and antisocial personality disorders, concluding that, when combined, the disorders reduce his inhibition to act on his sexual urges. Both experts also testified that pedophilic disorder is a lifelong condition from which respondent continues to suffer; indeed, respondent told Stanislaus as recently as 2021 that he continues to have erotic thoughts about young boys. Dees further explained that respondent's pedophilic disorder will continue to result in sexual urges towards children unless he participates in treatment, which respondent had not done. Based on all of this, both doctors opined that respondent's mental disorders predispose him to engage in future acts of sexual violence and make him substantially probable to sexually reoffend.

¶ 42    Based on this testimony, we conclude that a rational factfinder could find that respondent's mental disorders make him substantially likely to reoffend and, thus, respondent's sufficiency of the evidence claim fails. See, *e.g.*, *Evans*, 2021 IL App (1st) 192293, ¶¶ 19, 21, 29, 72 (rejecting argument that experts failed to connect mental disorder to risk where experts testified that the respondent had a qualifying "mental disorder that predisposes him to engage in acts of sexual violence" and that the respondent was "substantially probable" to "commit future acts of sexual violence"); *Montanez*, 2020 IL App (1st) 182239, ¶¶ 74-76 (expert who "identified that respondent was 'substantially probable' to reoffend" and opined that respondent was "dangerous" and predisposed to continue to engage in acts of sexual violence sufficiently "bridge[d] the connection between" his risk of reoffending and his mental disorders).

¶ 43                                    B. Closing Argument

¶ 44    Respondent argues that the State committed prosecutorial misconduct during closing arguments by bolstering and vouching for its expert witnesses, stating personal opinions, and arguing facts of respondent's sex crimes as substantive evidence.

¶ 45    This court applies an abuse of discretion standard to determining the propriety of a prosecutor's remarks during closing argument but reviews *de novo* whether any improper comments denied respondent a fair trial. *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007); see also *People v. Cook*, 2018 IL App (1st) 142134, ¶¶ 63-64 (reiterating the bifurcated standard of review for comments in closing arguments). Whether a claim is forfeited presents a question of law, which is reviewed *de novo*. *People v. Custer*, 2019 IL 123339, ¶ 19.

¶ 46    Before either side presented closing arguments, the trial court provided the following instruction:

> "What the attorneys say in arguments is not evidence and should not be considered by you as evidence. If an attorney makes a statement that is not based on the evidence or a reasonable inference to be drawn from the evidence, you should disregard the statement."

And, during the prosecutor's rebuttal argument, the court reiterated that "what the lawyers say during arguments is not evidence."

¶ 47    During closing arguments, the prosecutor explained that the State was required to prove three elements beyond a reasonable doubt: (1) respondent had a qualifying sexually violent offense, (2) respondent suffers from a qualifying mental disorder, and (3) respondent is substantially probable to commit future acts of sexual violence. The prosecutor asserted that the first element "is not up for debate" because both parties stipulated that respondent had been

convicted of four different qualifying offenses. The prosecutor similarly asserted that the second element "shouldn't really be up for debate after the testimony [the jury] heard" because two doctors testified that respondent suffers from pedophilic disorder and antisocial personality disorder. The prosecutor argued that both doctors testified "openly and honestly to explain" "everything they considered as to how they determined their opinions." The prosecutor noted that the experts "acknowledged the limits" of their testimony when such limits existed and the jurors "could be confident in the truth of what [the experts] told" them. Respondent did not object to any of these statements.

¶ 48 The prosecutor also noted the testimony of Drs. Stanislaus and Dees that respondent repeatedly lured young boys between the ages of 9 and 13 years old with force, money, and food—despite knowing that he could face prison for his offenses—because he "saw himself as helping these boys" and "he got some enjoyment out of it." The prosecutor stated that both doctors saw a pattern and thought that the jury could see the pattern, too. Respondent did not object to any of these statements.

¶ 49 The prosecutor argued that the jury should not "get taken in by the idea that these young boys were somehow complicit" in respondent's behavior, to which respondent objected but was overruled. The prosecutor further conceded that Dr. Nicolai is a "qualified expert," but argued that she "got it wrong" when she concluded that respondent is not an SVP and told the jury "with a straight face that the respondent did not have a mental disorder" despite his numerous offenses against young boys. The prosecutor stated that, considering the State's evidence, she thought the State had clearly proven the second criteria, to which respondent did not object. When the

prosecutor stated that if the jury was determined to credit Dr. Nicolai's testimony, "there is nothing that I can say here to convince you otherwise," respondent objected but was overruled.

¶ 50    As for the third element—whether respondent is substantially probable to commit future acts of sexual violence—the prosecutor argued that Stanislaus and Dees both assessed respondent's risk of reoffending and told the jury "honestly about any mistakes or errors they had made in their calculations," but noted that these mistakes did not alter either doctor's conclusions. The prosecutor noted that both doctors applied actuarial instruments and analyzed respondent's dynamic and protective risk factors. The prosecutor emphasized the doctors' testimony that respondent lacked any protective factors and scored in the average risk range to reoffend. The prosecutor also compared Stanislaus's testimony that respondent was in the 79th percentile to reoffend to the methods by which doctors assess a child's physical development, explaining that "those of you who have kids" know that if a child's head size is in the "eightieth percentile" then "your kid's head is really big." Respondent did not object to this comparison.

¶ 51    During rebuttal, the prosecutor discussed respondent's risk of reoffending and explained that respondent's use of a wheelchair could make him more dangerous because he appears "disarming" to parents and children. Respondent did not object to this characterization, either.

¶ 52    Respondent's counsel, by contrast, argued that none of the doctors were "biased" but merely reached different conclusions about respondent's risk of reoffending. Counsel stated that Stanislaus showed "honesty" by conceding that she changed her actuarial score, but argued that this change "may show that [she] got it wrong before" and that "it's not easy" for the doctors to reach their conclusions. Counsel also emphasized that the doctors considered "things that happened a long time ago" and stated that "[he has] a problem with" the fact that doctors look at

incidents that do not result in charges or sentences. Counsel noted that Nicolai determined that respondent did not qualify as an SVP and argued that "given what [the jury] heard"—including the fact that the experts "are in conflict with each other"—respondent "is not substantially likely to reoffend" and the State had not carried its burden.

¶ 53    Respondent challenges the following comments made during the State's closing argument:

(1) that the experts testified "openly and honestly," the jury "could be confident in the truth of what they told [the jury] on the stand," and that the jury could be "confident in the truth" of what the experts said;

(2) the prosecutor's statement that "[She] do[esn't] think that" whether respondent is substantially probable to reoffend "is up for debate";

(3) that the prosecutor did not "think [the jury] need[s] a degree. [She] think[s] you can see the pattern as well";

(4) that if the jury did not believe Stanislaus and Dees, "there is nothing that I can say here to convince you otherwise";

(5) that the prosecutor "think[s] the People have clearly proven the second criteria";

(6) that the prosecutor "do[esn't] want you for one moment to get taken in by the idea that these young boys were somehow complicit in this behavior";

(7) the prosecutor's invocation of the jurors' children when explaining respondent's risk of reoffending; and

(8) the prosecutor's reference to respondent's medical condition and stating that it will decrease parents' inhibitions and allow him to prey on children more effectively because he does not seem like a threat.

¶ 54    Respondent has preserved only claim 6 for review and forfeited his remaining claims by failing to both contemporaneously object when the challenged statements were made at trial and include them in his posttrial motion. As respondent concedes, "to properly preserve an issue for appeal, a party must both make a contemporaneous objection *and* raise the issue in a posttrial motion." (Emphasis added.) *Jackson v. Seib*, 372 Ill. App. 3d 1061, 1076 (2007). "A party's failure to make a contemporaneous objection" to closing arguments "result[s] in forfeiture of the issue." *Vanderhoof v. Berk*, 2015 IL App (1st) 132927, ¶ 94; accord *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 13. Likewise, "[t]he law is well established that in order to preserve an issue for appeal, the party must" raise it in "a written posttrial motion." *Fields*, 2012 IL App (1st) 112191, ¶ 53; accord *In re Detention of Melcher*, 2013 IL App (1st) 123085, ¶ 65 (respondent forfeited his claim because he failed to raise it in his posttrial motion). Thus, because respondent failed to contemporaneously object to seven of the eight remarks at trial and challenge them in his posttrial motion, those seven claims (*i.e.*, claims 1-5 and 7-8) are forfeited.

¶ 55    Respondent argues that this court should excuse his forfeiture under the plain-error doctrine because the evidence concerning whether he met the criteria of an SVP was closely balanced. This court has applied the criminal plain-error doctrine to SVP proceedings, despite their civil nature. *See In re Commitment of Curtner*, 2012 IL App (4th) 110820, ¶ 26. The plain-error rule allows courts to review a forfeited error if the error falls under one of two alternative prongs:

    " '(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of

the judicial process, regardless of the closeness of the evidence.' " *People v. Johnson*, 2024 IL 130191, ¶ 43 (quoting *People v. Moon*, 2022 IL 125959, ¶ 20).

"Under both prongs, the burden remains with the [respondent] to persuade the court to excuse the forfeiture." *Id.* "Our first step in plain error review is to determine whether any error occurred at all." *People v. Sullivan*, 2014 IL App (3d) 120312, ¶ 26. Reviewing courts are to consider the whole closing argument, rather than focusing on selected phrases or remarks, in determining whether there was prejudicial error. *People v. Lewis*, 2017 IL App (4th) 150124, ¶ 67; see *People v. Quezada*, 2024 IL 128805, ¶ 57 ("appropriate way to address unpreserved errors in a cumulative error claim is to determine whether the aggregate effect of those errors rises to the level of plain error").

¶ 56 Regarding respondent's forfeited challenges to the prosecutor's statements, we find that no error occurred. First, respondent argues that the prosecutor improperly engaged in bolstering and vouching for the State's expert witnesses. It is improper for a prosecutor to personally vouch for a witness's credibility or express a personal opinion. *People v. Emerson*, 122 Ill. 2d 411, 434 (1987). However, a prosecutor may comment on a witness's credibility (*People v. Richardson*, 123 Ill. 2d 322, 356 (1988)), and challenge a defendant's credibility and defense theory when such remarks are based on facts in evidence or reasonable inferences drawn therefrom. *People v. Hudson*, 157 Ill. 2d 401, 444 (1993).

¶ 57 Viewing the challenged statements in context, we conclude that the prosecutor was not improperly offering a personal opinion on the truth of a witness's statement. Rather, the prosecutor was arguing that Drs. Stanislaus and Dees testified credibly despite making certain errors in their calculations of respondent's risk to reoffend because they honestly acknowledged the mistakes

they had made in their calculations and had reviewed their evaluations of respondent so they could be confident in the truth of their testimony. Contrary to respondent's argument on appeal, the prosecutor's challenged statements did not leave the impression that the prosecutor knew the evidence better than the jury and therefore the jury should trust the prosecutor's judgment rather than its own. See *People v. Williams*, 2015 IL App (1st) 122745, ¶ 20 ("courts should use a commonsense approach to determine whether the statements convey to a reasonable juror that the prosecutor believes that a witness is credible based on the prosecutor's personal knowledge, other information not contained in record, or that the testimony is credible because it has the approval of the government").

¶ 58    Next, respondent argues that the prosecutor repeatedly inserted her personal opinion during closing argument by couching her arguments with the term "I," and thereby improperly aligned herself with the jurors and told them that she personally believed Drs. Stanislaus and Dees and specifically disbelieved respondent's expert Dr. Nicolai. We reject respondent's characterization of the prosecutor's comments about the State meeting its burden to prove the three elements to establish that respondent is an SVP as the insertion of the prosecutor's personal opinion. Instead, we conclude that the prosecutor's remarks were fair comments on the evidence. See *People v. Baker*, 195 Ill. App. 3d 785, 788 (1990), overruled on other grounds, *People v. Love*, 177 Ill. 2d 550, 556 (1997) ("[w]hile it might be good practice for prosecutors to refrain in argument from using sentences beginning with, 'I believe' or 'I think,' we reject defendant's argument that any time a prosecutor does so error results").

¶ 59    Respondent also argues that the prosecutor attempted to inflame the emotions of the jury and scare it into deciding that respondent is an SVP by using the jurors' children as a comparison

to sex offenders and by referencing how respondent's medical issues made him more dangerous. We disagree. In context, the prosecutor was explaining the relevance of respondent's percentile rank based on the experts' testimonies regarding the rate on reoffending. Moreover, in rebuttal, the prosecutor stated that the doctors had considered respondent's medical condition and concluded that it was not a protective factor and could make respondent more dangerous by appearing disarming in a wheelchair, particularly where he had groomed and preyed on children under the guise of tutoring them. This argument was based on facts in evidence and reasonable inferences drawn therefrom.

¶ 60    Nevertheless, even if respondent's unpreserved claims did amount to clear or obvious error, they are not susceptible to review as first-prong plain error because the evidence at trial was not so closely balanced that the "verdict may have resulted from the error and not the evidence." *People v. Williams*, 2022 IL 126918, ¶ 57. The " 'totality of the evidence' " and " 'a qualitative, commonsense assessment of [all the evidence] within the context of th[is] case' " (*People v. Logan*, 2024 IL 129054, ¶ 71), establishes that the evidence proving that respondent is an SVP was overwhelming and not closely balanced.

¶ 61    It is undisputed that respondent has four separate convictions for criminal sexual assault, each a qualifying sexually violent offense under the Act. And two experts opined that respondent suffers from multiple mental disorders that make him substantially probable to engage in future acts of sexual violence. In reaching their conclusions, both experts considered respondent's repeated violations of parole conditions and institutional rules, and his extensive history of committing sexual offenses, including five convictions for sexual misconduct against young boys. The experts concluded that respondent suffers from multiple mental disorders, characterized by a

deviant sexual interest in children and inability to control his sexual urges, and that these disorders make respondent substantially probable to sexually reoffend. Respondent's disorders require sex offender treatment, but respondent had engaged in no treatment to mitigate his substantial risk of reoffense. To the contrary, respondent continued to be aroused by thoughts of young boys and masturbated to those thoughts in 2021. In short, the State presented compelling evidence that respondent is an SVP.

¶ 62    Dr. Nicolai's contrary opinion does not undermine the strength of the evidence proving that respondent is an SVP. Nicolai's opinion that respondent did not suffer from pedophilic disorder was not credible on its face because it was based on her purported inability to "identify a pattern of sexually offending against prepubescent boys" despite her recognition that respondent performed oral sex on boys between the ages of 11 and 13 years old more than 87 times. Moreover, Nicolai neither interviewed respondent nor considered that he told Stanislaus in 2021 that he masturbates to thoughts of children. In addition, Nicolai conceded that her opinion might have been different had she known of respondent's admission to Stanislaus. Finally, like the State's experts, Nicolai scored respondent in the "average" risk category to reoffend and opined that he needed sex offender treatment to meaningfully change his behaviors, but she did not explain to the jury why dynamic risk factors—which she considered—did not increase his risk. Nicolai's testimony did not refute the strong evidence proving that respondent is an SVP.

¶ 63    Accordingly, respondent fails to meet his burden to prove that the evidence was so closely balanced that the alleged errors alone threatened to tip the scales of justice against him, regardless of the seriousness of the errors. Because respondent has not shown that the alleged errors are

susceptible to plain-error review, we hold him to his forfeiture of his claims concerning the prosecutor's arguments in claims 1-5 and 7-8.

¶ 64     Respondent's sole preserved claim—challenging the prosecutor's statement that she did not want the jury to get "taken in by the idea that these young boys were complicit"—fails because the statement was neither erroneous nor substantially prejudicial.

¶ 65     Challenged comments "must be considered in context of the entire closing arguments made by both parties." *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 30. Reversal is reserved for rare cases where "the comments were of such magnitude that they resulted in substantial prejudice to the respondent and constituted a material factor in the verdict." *In re Commitment of Tenorio*, 2020 IL App (1st) 182608, ¶ 42.

¶ 66     Counsel's statement that he "d[oes] not want [the jury] for one moment to get taken in by the idea that these young boys were somehow complicit in this behavior" was not improper because it reasonably commented on the evidence adduced at trial, specifically, the evidence that some of respondent's victims willingly went to respondent's house to receive money and food.

¶ 67     "A prosecutor has wide latitude in making a closing argument" and "may comment on the evidence and any fair, reasonable inferences it yields." *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Closing arguments must be viewed in their "entirety" and "challenged remarks must be viewed in their context." *Id.*; see *In re Commitment of Kelley*, 2012 IL App (1st) 110240, ¶ 42 (When courts "review a challenge to remarks made by the prosecution during closing arguments, the comments must be considered in [the] context of the entire closing arguments made by both parties."). Here, respondent's own expert testified that she did not diagnose respondent with pedophilic disorder because respondent's victims voluntarily went to his house and, consequently,

she could not be sure that the victims were not "seeking [ ] out" respondent's sexual advances. It was within the wide latitude afforded to counsel to respond to Dr. Nicolai's characterization of respondent's acts. *Kelley*, 2012 IL App (1st) 110240, ¶ 42 ("[T]he prosecution may comment upon *** the defense characterizations of the evidence or case").

¶ 68    Moreover, the context in which the statement was made further demonstrates that it was intended to address Nicolai's testimony that respondent had not preyed on his victims. Shortly before the challenged statement, the prosecutor emphasized that respondent "chose certain occupations that drew him into close contact" with his victims and that he "saw himself as helping these boys." Immediately after stating that the jury should not get taken in by the idea that the boys were complicit, the prosecutor noted that respondent "figured he could bring his victims to him" by "putting these boys on the payroll, having them show up on the first of the month for their $11 and buying them pizza" in order to "continue to bring them into his reach." Thus, the challenged statement, in conjunction with the surrounding statements, appropriately commented on the evidence and was not erroneous.

¶ 69    Nevertheless, even if respondent could establish that the prosecutor's remark was improper, respondent is not entitled to a new trial because he cannot show substantial prejudice. *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 69 (applying substantial prejudice standard in fair-trial claim). Respondent cannot carry that heavy burden because he cannot show that it "is impossible to discern whether the verdict was based on the evidence or the improper remarks." *Id*.

¶ 70    First, the trial court's jury instructions mitigated any potential prejudice that could have resulted from the prosecutor's closing arguments. The court's repeated admonishments that closing arguments were not evidence "protect [respondent] against any prejudice caused by

improper comments made during closing arguments" (*People v. Boston*, 2018 IL App (1st) 140369, ¶ 103), because the jury presumptively followed those instructions (see *People v. Wilmington*, 2013 IL 112938, ¶ 49 ("Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them.")). Respondent has offered no basis to conclude that the jury failed to follow the trial court's repeated admonishments such that he could have been prejudiced by the allegedly improper remark.

¶ 71 Moreover, the jury heard ample evidence that respondent has a qualifying mental disorder that makes him substantially probable to sexually reoffend, and any error in the closing remarks had no bearing on the jury's verdict. See *Butler*, 2013 IL App (1st) 113606, ¶¶ 7, 38 (where experts determined that respondent was an SVP, the prosecutor's closing remarks, "even if error," were not of "such magnitude that they resulted in substantial prejudice to defendant and constituted a material factor" in the jury's verdict); *Kelley*, 2012 IL App (1st) 110240, ¶¶ 6-28, 47 (where two experts opined that respondent was an SVP, any improper comments during closing arguments did not prejudice defendant). Considering the overwhelming evidence that respondent is an SVP, respondent has failed to show that it is "impossible" (*People v. Kirchner*, 194 Ill. 2d 502, 549-50 (2000)), to know whether the jury based its verdict on the single allegedly improper remark during closing arguments.

¶ 72                                      III. CONCLUSION

¶ 73 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 74 Affirmed.